# Exhibit 19

# Global Standard Essential Patent Litigation: The Anti-Suit and Anti-Anti-Suit Injunctions

*Igor Nikolic\**

*Abstract. The global litigation of standard essential patents ("SEP") is witnessing jurisdictional battles between national courts. As a result, some courts have started issuing anti-suit injunctions ("ASI") to prohibit parallel litigation and consolidate the dispute at a single venue, while others have retaliated with anti-anti-suit injunctions ("AASI"), barring parties from seeking or enforcing foreign ASIs. The anti-suit injunction saga benefits no one: the parties in SEP licensing disputes are faced with legal uncertainty as to which court will hear their case; the dispute incentivizes a race to the court to secure the most favorable jurisdiction instead of focusing on licensing negotiations; the dispute increases litigation costs of having to pursue multiple ASIs and AASIs; and parties face fines and imprisonment of officials for non-compliance. This Article will examine the general conditions for the grant of ASIs and AASIs and analyze their application in SEP disputes. This Article will then propose three measures that courts can take to stop the global jurisdictional race. First, courts should exercise judicial restraint and return to the originally strict criteria for the granting of ASIs. Second, a court could hold a party seeking an ASI as "unwilling" to license, acting as a strong deterrent from seeking this type of remedy. Third, courts could focus on the negotiating behavior of the parties rather than directly setting global FRAND terms. Taking these principles into account would ensure that each national court is respected and would incentivize parties to try and reach an amicable solution on the appropriate FRAND licensing terms.*

\*  Research Fellow, European University Institute, Florence. Contact: igor.nikolic@eui.eu. This Article benefited from an unrestricted grant of 4IP Council. All views are author's own.

## Introduction

International technical standardization has produced important technologies such as 2G, 3G, 4G, 5G, and Wi-Fi, which enable connectivity for our smartphones, tablets, computers, and various other devices.[1] Their importance for today's global economy is enormous. It is estimated that the recent 5G standard will produce up to €2.0 trillion in sales growth and add twenty million jobs across all sectors of the economy between 2021–2025.[2] It will bring connectivity to diverse industry sectors, from automotive and consumer devices to healthcare and agriculture.[3] With its wide applicability in various uses, some have characterized it as the next general-purpose technology.[4]

These technical standards are developed under the auspices of Standards Development Organizations ("SDOs"), where industry participants—including companies that develop technologies and the users of standards—cooperate to develop standards that address technological problems.[5] The technologies that compose the standard are often protected by standard essential patents ("SEPs"), and their owners typically commit to offer a license to these SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms.[6] FRAND terms are intended to ensure that the standard is widely accessible to implementers while at the same time providing adequate returns on innovation to technology developers.[7]

---

[1] On the benefits of international collaborative technical standardization see Jorge Padilla, John Davies & Aleksandra Boutin, *Economic Impact of Technology Standards*, COMPASS LEXECON (Sept. 2017), https://perma.cc/95CY-9ZF5; European Commission, *European Standards for the 21st Century*, at 4–5, COM (2016) 358 final (June 1, 2016); Int'l Telecomm. Union [ITU], *Understanding Patents, Competition & Standardization in an Interconnected World*, at 15 (2014).

[2] JEFFERSON WANG, HILLOL ROY, SYED ALAM, TEJAS RAO, SAMIR AHSHRUP & WILLIAM MCCLUSKEY, THE IMPACT OF 5G ON THE EUROPEAN ECONOMY 3, 5 (2021), https://perma.cc/PTW2-SB5T.

[3] *Id.* at 7–8.

[4] *See* IHS MARKIT, THE 5G ECONOMY: HOW 5G WILL CONTRIBUTE TO THE GLOBAL ECONOMY (2019), https://perma.cc/CT8H-CKZ6; David J. Teece, *Profiting from Innovation in the Digital Economy: Enabling Technologies, Standards, and Licensing Models in the Wireless World*, 47 RSCH. POL'Y 1367, 1367, 1369, 1371 (2018).

[5] On SDOs see JUSTUS BARON, JORGE CONTRERAS, MARTIN HUSOVEC & PIERRE LAROUCHE, EUR. COMM'N, JOINT RSCH. CTR., MAKING THE RULES: THE GOVERNANCE OF STANDARD DEVELOPMENT ORGANIZATIONS AND THEIR POLICIES ON INTELLECTUAL PROPERTY RIGHTS 20 (Nikolaus Thumm ed., 2019), https://perma.cc/J9VG-KN8B.

[6] Justus Baron & Daniel Spulber, *Technology Standards and Standard Setting Organizations: Introduction to the Searle Center Database*, 27 J. ECON. & MGMT. STRATEGY 462, 465, 479 (2018) (finding that out of thirty-seven surveyed SDOs, thirty-two provide for FRAND licensing).

[7] *See* EUR. TELECOMM. STANDARDS INST., ETSI DIRECTIVES: VERSION 43 at 41 (2021), https://perma.cc/4AMT-J5AV ("[T]he ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the right of the owners of IPRs. IPR

At times, SEP owners and implementers clash over the precise meaning of FRAND licensing terms.[8] This is despite the FRAND framework's general success, which has enabled unprecedented innovation in the information and communications technology ("ICT") industry.[9] In fact, most licenses are concluded without litigation, and the openness and flexibility of FRAND terms enable licenses to be adjusted to the specifics of each industry and individual company.[10] Nevertheless, over the years, disputes related to the licensing of SEPs have emerged, including issues such as the appropriate methodologies to calculate FRAND royalties, the suitable royalty base for the application of a FRAND royalty rate, the availability of injunctions to SEP owners, the position in the production chain for licensing, and the application of competition laws to the SEP owners' conduct.[11]

A controversial issue that has recently emerged in SEP litigation is the issuance of anti-suit injunctions ("ASI") in one jurisdiction that prohibits a party from initiating or continuing with SEP litigation in other jurisdictions.[12] Other courts may retaliate by granting a corresponding anti-anti-suit injunction ("AASI") prohibiting the party from applying for or enforcing an ASI.[13]

The argument typically presented in favor of using ASIs is that they enable the consolidation of global litigation before one court, thus saving litigation costs and preventing conflicting parallel judgments.[14] Another argument is that they are a "powerful tool" for prospective licensees against SEP owners that may have failed to comply with their FRAND licensing obligations.[15] This way, it is argued, the court may issue an ASI to prevent the SEP owner from bringing parallel foreign patent infringement and injunction suits until it has resolved the FRAND licensing dispute.[16]

---

holders . . . should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS . . . .").

[8]  For an overview of SEP disputes and issues see generally IGOR NIKOLIC, LICENSING STANDARD ESSENTIAL PATENTS: FRAND AND THE INTERNET OF THINGS (2021); CHRYSSOULA PENTHEROUDAKIS & JUSTUS A. BARON, EUR. COMM'N, JOINT RSCH. CTR., LICENSING TERMS OF STANDARD ESSENTIAL PATENTS: A COMPREHENSIVE ANALYSIS OF CASES 40–41 (Nikolaus Thumm ed., 2017), https://perma.cc/N4L7-FB2D.

[9]  Daniel F. Spulber, *Licensing Standard Essential Patents with FRAND Commitments: Preparing for 5G Mobile Telecommunications*, 18 COLO. TECH. L.J. 79, 120, 158 (2020).

[10]  *Id.* at 88–95, 120.

[11]  For overview of SEP litigation see generally NIKOLIC, *supra* note 8.

[12]  *See infra* Part III.

[13]  *See infra* Part III.

[14]  Jorge L. Contreras & Michael A. Eixenberger, *The Anti-Suit Injunction – A Transnational Remedy for Multi-Jurisdictional SEP Litigation*, *in* THE CAMBRIDGE HANDBOOK OF TECHNICAL STANDARDIZATION LAW: COMPETITION, ANTITRUST, AND PATENTS 451, 451 (Jorge L. Contreras ed., 2018).

[15]  *Id.*

[16]  *Id.*

However, the wide use of ASIs may also lead to important undesirable effects. While ASIs could be helpful in some contexts, they may be seen in patent cases as a radical remedy that precludes a foreign court from adjudicating on its national patent. Additionally, they may be prone to abuse and litigation gamesmanship, as parties may, instead of negotiating a license in good faith, race to be the first to sue in a favorable jurisdiction and secure an ASI. Correspondingly, ASIs may lead to a race to the bottom between courts to attract litigants to their jurisdictions by adopting approaches that may be viewed as more favorable to one side.[17] For example, courts that are perceived as granting lower FRAND royalties would naturally attract implementers to sue first and request an ASI preventing the SEP owner from initiating or maintaining parallel patent litigation in other jurisdictions. Equally, SEP owners may also want to quickly initiate litigation in a country seen as having stronger IP protection and determining higher FRAND royalties. ASIs thus raise the fundamental question of whether any court has the right to decide that it is better placed than another equally competent court to resolve the terms of a FRAND license.

The effects of global jurisdictional battles can be observed in recent SEP disputes. When Chinese courts issued wide ASIs, prohibiting any other SEP litigation anywhere in the world, other countries like the United States, India, and Germany responded with corresponding AASIs, allowing their domestic proceedings to go ahead.[18] Considering that China's application of ASIs impermissibly restricted SEP owners from exercising their rights and created barriers to trade, the EU, the United States, Canada, and Japan jointly requested consultations with China before the World Trade Organization in 2022.[19]

Against this background, the aim of this Article is to examine first why there has been a rise of ASI and AASI cases around the world in SEP licensing disputes and, second, what can be done to mitigate their use. This Article shows that, in fact, the conditions for granting of ASIs in the UK and the United States are strict and take into account the effects on international comity. To date, ASIs in the United States have been rarely granted and only in the narrowest form—against the enforcement of foreign patent injunctions.[20] Conflicts with other jurisdictions arise only when the conditions for the grant of ASIs are interpreted more flexibly and the scope

---

[17] Jorge L. Contreras, *The New Extraterritoriality: FRAND Royalties, Anti-Suit Injunctions and the Global Race to the Bottom in Disputes over Standards-Essential Patents*, 25 B.U. J. SCI. & TECH. L. 251, 280–82 (2019).

[18] *See infra* Part IV.

[19] Request for Consultations by the European Union, *China—Enforcement of Intellectual Property Rights*, WTO Doc. WT/DS611/1 (Feb. 22, 2022); *DS611: China—Enforcement of Intellectual Property Rights*, WORLD TRADE ORG., https://perma.cc/2JAV-8C7E (May 9, 2022).

[20] *See infra* Section III.A.

of an issued ASI is so broad as to include any existing and future SEP disputes.[21] A natural response to extremely wide ASIs is the issuance of AASIs by other courts to protect their jurisdictions.[22] The jurisdictional battles drain judicial resources, while fines and imprisonment of corporate officials for non-compliance create business uncertainty and disproportionate costs to companies. Accordingly, this Article suggests three measures that courts may take that could put an end to jurisdictional conflicts in SEP licensing disputes.

This Article is structured as follows. First, Part I explains the nature of SEP disputes to demonstrate why SEP litigation is global and how parallel cross-border litigations may impact each other. Next, Part II examines the conditions for the grant of ASIs and AASIs in Europe and the United States to understand the precise conditions for their application. Then, Part III analyzes the use of ASIs and AASIs in SEP litigation. Finally, this Article suggests three measures that may incentivize the parties to focus on good faith licensing negotiations that may assist them in reaching an agreement on FRAND licensing, instead of using creative litigation strategies.

## I.    Global Commercial Disputes and National Patent Litigation

In today's globalized world, both SEP owners and implementers have a worldwide presence. According to one study, an average patent family at the European Telecommunications Standards Institute, a Standards Development Organization responsible for cellular standardization, spans 6.6 jurisdictions, while some are present in as many as 26 countries.[23] Implementers, like smartphone and car manufacturers, are often operating globally and have worldwide sales. Such companies would naturally negotiate licensing agreements that are global in scope in order to secure freedom to operate.

In case of disagreement over the precise terms of a FRAND license, tensions arise between a commercial dispute that is global and patent rights that are national. Both parties have at their disposal several offensive actions before national courts if negotiations break down to advance their commercial licensing objectives. The SEP owner may sue on its national SEPs and request a court to issue an injunction in that jurisdiction or grant damages for the infringement of national SEPs. SEP litigation, for this reason, often occurs in multiple jurisdictions in Europe, North America, and Asia. For

---

[21] *See infra* Sections III.C–D.

[22] *See infra* Section III.D.

[23] Rudi Bekkers, Emilio Raiteri, Arianna Martinelli & Elena M. Tur, Eur. Comm'n, Joint Rsch. Ctr., Landscape Study of Potentially Essential Patents Disclosed to ETSI 34 (Nikolaus Thumm ed., 2020), https://perma.cc/AWT3-EGEJ.

instance, a recent dispute between Ericsson and Samsung involved courts in the United States, China, Germany, Belgium, and the Netherlands.[24] The SEP owner may also request a declaratory judgment that it offered FRAND terms in jurisdictions that allow such claims.[25] On the other hand, implementers may also take proactive actions to invalidate SEPs or to obtain declarations of non-infringement.[26] In jurisdictions that characterize the FRAND commitment as a contract that is enforceable by the intended third-party beneficiaries, implementers may also raise breach of contract claims that the SEP owner failed to offer FRAND licensing terms, and request the court to set the terms of a FRAND license.[27] Finally, implementers have often invoked competition law claims, arguing that SEP owners abused their dominant position on the market. For instance, Apple sued Qualcomm in the United States, UK, Japan, China, and Taiwan raising contract, patent, and antitrust claims.[28] The list of actions that parties use in SEP litigation is shown in Table 1 below.

**Table 1: List of Actions Used in SEP Disputes**

| Type of action | SEP owner | Implementer |
|---|---|---|
| **Patent claims** | Patent infringement, injunction, and/or damages | Invalidity and non-infringement of patents |
| **FRAND claims** | A declaratory judgment that offered licensing | Breach of contract action—offered terms are |

---

[24] Mathieu Klos, *Ericsson Sues Samsung for Patent Infringement in Europe*, JUVE PATENT (May 7, 2021), https://perma.cc/NRB6-A2UT.

[25] This is the approach mostly used in the United States. *See* HTC Corp. v. Telefonaktiebolaget LM Ericsson, 12 F.4th 476, 482 (5th Cir. 2021); Optis Wireless Tech., LLC v. Huawei Device USA, Inc., No. 17-CV-00123, 2019 WL 1244707, at *2 (E.D. Tex. Mar. 18, 2019).

[26] Katrin Cremers, Max Ernicke, Fabian Gaessler, Dietmar Harhoff, Christian Helmers, Luke McDonagh, Paula Schliessler & Nicolas van Zeebroeck, *Patent Litigation in Europe*, 44 EUR. J.L. & ECON. 1 (2016); *Declarations of Non-Infringement and Compulsory Licences*, EUR. PAT. ACAD. 1, https://perma.cc/X74S-CN32; *Proceedings for Invalidity*, EUR. PAT. ACAD. 1, https://perma.cc/7VW4-WWPY; Peter J. Shurn III, *Using Declaratory Judgments Offensively in Patent Cases: DJ Jive*, 3 J. MARSHALL REV. INTELL. PROP. L. 1, 2 (2003).

[27] This appears to be the accepted position in the UK and the United States. *See* Unwired Planet Int'l Ltd. v. Huawei Techs. Co. [2017] EWHC (Pat) 2988 [23], [122], [169]; Microsoft Corp. v. Motorola, Inc., 854 F. Supp. 2d 993, 1002–03 (W.D. Wash. 2012). German courts, on the other hand, seem to see a FRAND commitment merely as declaratory in nature and have not yet recognized it as constituting a binding contract for the benefit of third parties. *See* Landgericht Düsseldorf [LG] [Düsseldorf Regional Court] Apr. 24, 2012, 4b O 274/10 (Ger.), https://perma.cc/QJ43-73Q7. Whether a FRAND commitment is breached will be assessed at the injunction stage of the patent trial per the CJEU's *Huawei v. ZTE* requirements. *See* Case C-170/13, Huawei Techs. Co. v. ZTE Corp., ECLI:EU:C:2015:477, ¶¶ 27–28, 41 (July 16, 2015).

[28] Apple Inc. v. Qualcomm Inc., No. 17-cv-00108, 2017 WL 3966944, at *3 (S.D. Cal. Sept. 7, 2017).

| | terms are FRAND and/or determination of FRAND licensing terms | not FRAND and a court determination of FRAND terms |
|---|---|---|
| **Competition law claims** | / | Abuse of dominant position by the SEP owner |

The different patent and non-patent litigations in various jurisdictions may impact each other in different ways. If one court proceeds quickly in resolving a patent case and decides to grant an injunction, the implementer might be compelled to settle all litigation to avoid a national injunction. Similarly, a court that is the first to determine FRAND licensing terms between the parties might preclude remaining patent litigation in other countries if parties accept such a license. Thus, the "first to final judgment" court can effectively be the one that resolves a global dispute between the parties.

For these reasons, some courts have started issuing anti-suit injunctions to consolidate all the litigation in one forum and assert their jurisdictions against other courts.[29] The precise conditions for granting such a remedy will be examined below.

## II.  Procedural Remedies to Consolidate SEP Disputes

Courts faced with an SEP dispute may use different procedural tools to prevent other courts from interfering with domestic proceedings. Three remedies may be distinguished: (1) anti-suit injunctions; (2) anti-enforcement injunctions; and (3) anti-anti-suit injunctions.

An anti-suit injunction is an order from one court to the party not to pursue, or not to commence, court proceedings abroad.[30] Compliance is secured by the threat of punishment for contempt of court.[31] Thus, ASIs are not directed at a foreign court and do not stop foreign proceedings automatically but are addressed to the parties who will be practically compelled to withdraw or not pursue foreign proceedings because of the threat of punishment for non-compliance. Historically, ASIs originated in England, where "the English Court of Chancery . . . restrained litigants before

---

[29]  *See infra* Part III.

[30]  Thomas Raphael, The Anti-Suit Injunction 2 (2d ed. 2019) ("An anti-suit injunction is an order of the court requiring the injunction defendant not to commence, or to cease to pursue, or not to advance particular claims within, or take steps to terminate or suspend, court or arbitration proceedings in a foreign country . . . ."); *see also* George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation*, 28 Colum. J. Transnat'l L. 589, 589 (1990); Geoffrey Fisher, *Anti-Suit Injunctions to Restrain Foreign Proceedings in Breach of an Arbitration Agreement*, 22 Bond L. Rev. 1, 1 (2010).

[31]  Fisher, *supra* note 30, at 16 & n. 62.

the English common law courts from obtaining judgments which were contrary to the principles of equity."[32] ASIs are, therefore, largely a characteristic of common law countries.[33] They are mostly used to safeguard the exclusive contractual jurisdiction of a national court or arbitration and are used in cases with cross-border elements such as insolvency, insurance claims, tort claims, and international commercial contract disputes.[34] The concerns of international comity (i.e., respect for other jurisdictions) play a large role in a decision whether to grant this remedy.

In the UK, the legal test for the issuance of ASIs is relatively broad. Article 37 of the Senior Courts Act provides that a court "may by order . . . grant an injunction . . . in all cases in which it appears to the court to be just and convenient to do so."[35] Although the grant of an ASI is ultimately a discretionary remedy, courts will tend to grant them in three scenarios: (1) to secure the protection of the contractual choice of forum clause (i.e., if foreign proceedings would be a breach of the contract's selection of a UK court as the exclusive dispute resolution forum or arbitration clause); (2) in cases where foreign proceedings overlap with matters that are being litigated in the UK and are considered to be "vexatious" and "oppressive"; and (3) when foreign proceedings risk interfering with pending proceedings before the English courts, provided that it is in the interest of justice to do so.[36]

If the criteria are met, a UK court will then assess the impact on international comity. Comity is an elastic concept which generally requires that courts and countries show each other mutual courtesy and respect.[37] Lord Justice Toulson summarized the principle in *Highland Crusader Offshore Partners v. Deutsche Bank AG*[38] as requiring

> the court to recognise that, in deciding questions of weight to be attached to different factors, different judges operating under different legal systems with different legal policies may legitimately arrive at different answers, without occasioning a breach of customary international law or manifest injustice, and that in such circumstances it is not for an English court to arrogate to itself the decision how a foreign court should determine the matter.[39]

---

[32] Raphael, *supra* note 30, at 37 (footnote omitted).

[33] Chukwudi Paschal Ojiegbe, *From West Tankers to Gazprom: Anti-Suit Injunctions, Arbitral Anti-Suit Orders and the Brussels I Recast*, 11 J. Priv. Int'l L. 267, 267 (2015).

[34] S.I. Strong, *Anti-Suit Injunctions in Judicial and Arbitral Procedures in the United States*, 66 Am. J. Compar. L. 153, 165–66 (2018).

[35] Senior Courts Act 1981, c. 54, § 37(1) (UK).

[36] Raphael, *supra* note 30, at 3; Steven Gee, *Lord Bingham, Anti-Suit Injunctions and Arbitration*, *in* Tom Bingham and the Transformation of the Law: A Liber Amicorum 635, 637 (Mads Andenas & Duncan Fairgrieve eds., 2009).

[37] *See* Agbaje v. Akinnoye-Agbaje [2010] UKSC 13, [51]–[54] (appeal taken from EWCA).

[38] [2009] EWCA (Civ) 725.

[39] *Id.* at [50].

Case 5:23-cv-00569-BO-RJ     Document 48-10     Filed 01/02/24     Page 9 of 36

In other words, there must be a good reason for the UK court to direct a party to stop foreign litigation and not defer the decision to a foreign court. Generally, the stronger the connection of the foreign court with the parties and the subject matter of the dispute, the stronger the argument against issuing an ASI.[40]

In the United States, the grant of ASIs is also subject to the court's discretion, and it is possible to distinguish three different approaches that have been adopted by various courts: conservative, liberal, and intermediate.[41] As a threshold matter, all three approaches require establishing that (1) the parties to the dispute are the same, and (2) the adjudication of the U.S. claim would be dispositive of foreign claims.[42] Once the threshold criteria have been satisfied, courts diverge on additional factors necessary for the granting of an ASI and the degree of permissible interference with international comity.[43]

Some courts have adopted a more conservative approach in granting ASIs, issuing such only if "(1) an action in a foreign jurisdiction would prevent United States jurisdiction or threaten a vital United States policy, and (2) the domestic interests outweigh concerns of international comity."[44] ASIs should accordingly be used "sparingly and only in the rarest of cases,"[45] and a greater emphasis should be given to the respect for international comity.[46]

Other courts have adopted a more liberal approach, "which places only modest emphasis on international comity."[47] They consider four criteria and

---

[40] *Id.*

[41] *See* Contreras & Eixenberger, *supra* note 14, at 453–54; Taryn Fry, *Injunction Junction, What's Your Function?: Resolving the Split over Antisuit Injunction Deference in Favor of International Comity*, 58 Catholic U. L. Rev. 1071, 1071, 1073–74 (2009); Strong, *supra* note 34, at 160–61; Daniel Tan, *Anti-Suit Injunctions and the Vexing Problem of Comity*, 45 Va. J. Int'l L. 283, 289 (2005).

[42] Strong, *supra* note 34, at 159.

[43] The principle of comity was mentioned by the U.S. Supreme Court as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." Hilton v. Guyot, 159 U.S. 113, 164 (1895); *see also* Société Nationale Industrielle Aérospatiale v. U.S. District Court, 482 U.S. 522, 543 n.27 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."); Bermann, *supra* note 30, at 608.

[44] Strong, *supra* note 34, at 160 (quoting Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft, 491 F.3d 355, 359 (8th Cir. 2007)); *see also* Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11, 17 (1st Cir. 2004); Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 161 (3d Cir. 2001).

[45] Gau Shan Co. v. Bankers Tr. Co., 956 F.2d 1349, 1354 (6th Cir. 1992).

[46] The conservative approach is followed by the First, Second, Third, Sixth, Eighth, and D.C. Circuit Courts. Strong, *supra* note 34, at 160.

[47] *Goss Int'l Corp.*, 491 F.3d at 360; *see also* Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 626–27 (5th Cir. 1996).

support the issuance of an ASI if at least one is fulfilled.[48] The criteria, known as the *Unterweser* criteria, would allow an ASI if foreign litigation: (1) frustrates a U.S. policy; (2) is "vexatious or oppressive"; (3) may "threaten the . . . court's in rem or quasi in rem jurisdiction"; or (4) "prejudice[s] other equitable considerations."[49] As a final step, courts following the liberal approach would assess whether the issuance of an ASI represents a "tolerable" impact on international comity,[50] which does not suggest the same deference to comity as in the conservative approach.

The intermediate approach sits between the two. It establishes a rebuttable presumption against the issuance of ASIs because considerations of international comity must be given substantial weight.[51] The presumption can be overcome by looking at the totality of circumstances in deciding whether a particular case warrants the issuance of an ASI.[52] Some of the factors are the nature of the two actions, the conduct of the parties, the importance of the policies at stake, and the extent to which a foreign action has the potential to undermine the court's ability to reach a just and speedy result.[53]

In continental Europe, ASIs are viewed with hostility by civil law systems, and courts are reluctant to grant them.[54] They are not allowed between EU courts under EU law.[55] Article 29(1) of EU Regulation 1215/2012 provides that once a proceeding has begun in a court in any EU Member State, all other courts within the EU must decline jurisdiction over parallel proceedings.[56] The Court of Justice of the European Union ("CJEU")

---

[48]   The liberal approach is adopted by the Fifth, Seventh, and Ninth Circuits. Contreras & Eixenberger, *supra* note 14, at 454; Fry, *supra* note 41, at 1079–83.

[49]   *In re* Unterweser Reederei, GMBH, 428 F.2d 888, 890 (5th Cir. 1970), *vacated*, M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972). Although the opinion was vacated, courts continue to cite it for its statement of these four criteria. *See, e.g.*, Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 881 (9th Cir. 2012).

[50]   *Id.*

[51]   The intermediate approach originates from *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 18 (1st Cir. 2004). It is applied by the First and Second Circuits.

[52]   *Id.*

[53]   *Id.* at 19.

[54]   Adrian Briggs, *Anti-Suit Injunctions and Utopian Ideals*, 120 LAW Q. REV. 529, 530 (2004); Nikiforos Sifakis, *Anti-Suit Injunctions in the European Union: A Necessary Mechanism in Resolving Jurisdictional Conflicts?*, 13 J. INT'L. MAR. L. 100 (2007).

[55]   Council Regulation 1215/2012, 2012 O.J. (L 351) 1, 12 (EU).

[56]   *Id.* ("[W]here proceedings involving the same cause of action and between the same parties are brought in the courts of different Member States, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established."); *see also id.* at 11 ("Where a court of a Member State is seised of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 24, it shall declare of its own motion that it has no jurisdiction.").

confirmed that ASIs within the EU are incompatible with EU law since they contravene the principle of mutual trust underpinning Regulation 1215/2012.[57] Thus, ASIs in the EU may only be possible to restrain parallel proceedings in non-EU countries, but the general distrust towards this type of remedy means that they are seldom given. More likely, the EU courts would simply refuse to recognize and enforce a foreign judgment.[58]

A special form of ASI is an anti-enforcement injunction ("AEI"), which restrains a party from enforcing a foreign judgment in a foreign country.[59] AEIs have a lesser impact on comity than full ASIs because the foreign proceedings can move on in parallel. Only the enforcement of a foreign judgment will be prevented until the granting court decides the case.[60] AEIs have become increasingly relevant in SEP cases but are rarely used in other contexts. Typically, a domestic court would refuse to recognize and enforce a foreign judgment impinging on domestic principles and proceedings.[61] In SEP litigation, however, the enforcement of a foreign patent injunction or determination of global FRAND licensing terms would impact domestic proceedings as the parties would be inclined to settle.

Finally, an anti-anti-suit injunction is an order from a court in one jurisdiction restraining a party from seeking or enforcing an ASI from a foreign court.[62] Failure to comply with an AASI is also sanctioned as a contempt of court and subject to monetary penalties or imprisonment.[63] It represents a response to an ASI granted by a foreign court and allows the continuation of domestic proceedings.[64] It is generally recognized and used by civil law countries against ASIs issued by common law systems.[65]

---

[57] Case C-159/02, Turner v. Grovit, 2004 E.C.R. I-03565, ¶ 31; Case C-185/07, Allianz SpA v. West Tankers Inc., 2009 E.C.R. I-00663, ¶¶ 28–34.

[58] Will Hueske, Note, *Rule, Britannia!: A Proposed Revival of the British Antisuit Injunction in the E.U. Legal Framework*, 41 GEO. WASH. INT'L L. REV. 433, 456 (2009).

[59] RAPHAEL, *supra* note 30, at 142–44; Strong, *supra* note 34, at 169.

[60] Strong, *supra* note 34, at 169.

[61] *E.g.*, 28 U.S.C. § 4102(a)(1)(A) (instructing U.S. courts to not enforce foreign judgments for defamation unless the foreign court applied law providing at least as much protection for freedom of speech and press as allowed under the U.S. Constitution and the relevant state constitution).

[62] RAPHAEL, *supra* note 30, at 142.

[63] *Id.* at 140.

[64] *Id.* at 139.

[65] *Id.* at 139–41.

## III. The Use of ASIs, AASIs, and AEIs in Global SEP Litigation

### A. *United States*

The U.S. courts were the first to use ASIs in SEP litigation.[66] However, the granted ASIs were narrow in scope and awarded only sparingly. Only one full ASI was issued prohibiting parallel litigation where both parties consented that a U.S. court should determine FRAND licensing terms.[67] Where there was no consent, U.S. courts in two cases issued only AEIs against foreign patent injunctions.[68] In more cases, ASIs were refused or courts did not reach a decision because the ASI request was withdrawn.[69]

---

[66] *See* Contreras & Eixenberger, *supra* note 14, at 456–57.

[67] TCL Commc'n Tech. Holdings v. Telefonaktiebolaget LM Ericsson, No. 14-cv-00341, 2015 U.S. Dist. LEXIS 191512, at *19 (C.D. Cal. June 29, 2015).

[68] Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 875 (9th Cir. 2012); Huawei Techs., Co. v. Samsung Elecs. Co., No. 16-cv-02787, 2018 WL 1784065, at *1 (N.D. Cal. Apr. 13, 2018), *vacated*, No. 16-cv-02787, 2019 WL 3369748 (N.D. Cal. Mar. 21, 2019).

[69] *E.g.*, Cont'l Auto. Sys., Inc. v. Avanci, LLC, No. 19-cv-02520, 2019 WL 6612012 (N.D. Cal. Dec. 5, 2019); Apple Inc. v. Qualcomm Inc., No. 17-cv-00108, 2017 WL 3966944 (S.D. Cal. Sept. 7, 2017); Vringo, Inc. v. ZTE Corp., No. 14-cv-4988, 2015 WL 3498634 (S.D.N.Y. June 3, 2015).

**Table 2: U.S. SEP Cases Involving ASIs and AASIs**

| ASI Granted | AEI Granted | AASI granted | ASI refused | ASI requested but not decided |
|---|---|---|---|---|
| *TCL v. Ericsson* (2015)[70] | *Microsoft v. Motorola* (2012)[71] | *Ericsson v. Samsung* (2021)[72] | *Vringo v. ZTE* (2015)[73] | *Continental v. Avanci* (2018)[74] |
| | *Huawei v. Samsung* (2018)[75] | | *Apple v. Qualcomm* (2017)[76] | *Lenovo v. IPCom* (2019)[77] |
| | | | *Optis v. Huawei* (2018)[78] | |

 *TCL v. Ericsson* is the only instance where a full ASI was issued prohibiting parallel patent litigation.[79] TCL sued Ericsson in the United States for breach of contract, requesting the determination of FRAND terms for Ericsson's SEP portfolio and raising claims of invalidity and non-infringement of Ericsson's SEPs.[80] Ericsson retaliated by bringing patent infringement claims in other jurisdictions (France, Brazil, Russia, the UK, Argentina, and Germany) and by requesting a determination of FRAND licensing terms from a U.S. court.[81] TCL then requested an ASI to prevent parallel patent infringement actions from going ahead.[82] In the meantime, the parties agreed that a U.S. court should resolve and determine global FRAND licensing terms.[83] Given such consent, the court "determine[d] that a bilateral preliminary anti-suit injunction [was] warranted based on the

---

[70] No. 14-cv-00341, 2015 U.S. Dist. LEXIS 191512 (C.D. Cal. June 29, 2015).

[71] 696 F.3d 872 (9th Cir. 2012).

[72] 20-CV-00380, 2021 WL 89980 (E.D. Tex. Jan. 11, 2021).

[73] No. 14-cv-4988, 2015 WL 3498634 (S.D.N.Y. June 3, 2015).

[74] No. 19-cv-02520, 2019 WL 6612012 (N.D. Cal. Dec. 5, 2019).

[75] No. 16-cv-02787, 2018 WL 1784065 (N.D. Cal. Apr. 13, 2018), *vacated*, No. 16-cv-02787, 2019 WL 3369748 (N.D. Cal. Mar. 21, 2019).

[76] No. 17-cv-00108, 2017 WL 3966944 (S.D. Cal. Sept. 7, 2017).

[77] No. 19-cv-01389, 2019 WL 6771784 (N.D. Cal. Dec. 12, 2019).

[78] No. 17-cv-00123, 2018 WL 3375192 (E.D. Tex. July 11, 2018).

[79] TCL Commc'n Tech. Holdings v. Telefonaktiebolaget LM Ericsson, No. 14-cv-00341, 2015 U.S. Dist. LEXIS 191512, at *19 (C.D. Cal. June 29, 2015)

[80] TCL Commc'n Tech. Holdings v. Telefonaktiebolaget LM Ericsson, No. 14-cv-00341, 2018 WL 4488286, at *3–4 (C.D. Cal. Sep. 14, 2018), *rev'd in part & vacated in part*, 943 F.3d 1360 (Fed. Cir. 2019).

[81] *Id.* at *2.

[82] *TCL Commc'n Tech.*, 2015 U.S. Dist. LEXIS 191512, at *5.

[83] *Id.*

parties' mutual agreement."[84] It thus granted an ASI prohibiting both parties from initiating or continuing with patent infringement actions involving SEPs until the case resolved.[85]

In two other cases, where there was no mutual consent for the U.S. court to be the single forum for the determination of global FRAND licensing terms, courts granted only AEIs against the enforcement of foreign patent injunctions. In *Microsoft v. Motorola,* the Court of Appeals for the Ninth Circuit approved an AEI barring Motorola from enforcing its patent injunction obtained in Germany.[86] Microsoft brought a breach of contract suit alleging that Motorola failed to offer a license on its SEP portfolio on FRAND terms.[87] Motorola retaliated by initiating patent infringement actions in the United States and, six months later, in Germany.[88] The German court was faster and, after finding two SEPs infringed, ordered an injunction against Microsoft, stopping it from selling Xbox consoles, Windows 7, and Internet Explorer software in Germany.[89] Microsoft then asked the U.S. district court to enter an AEI against Motorola, prohibiting it from enforcing the German injunction until the contractual dispute was resolved in the United States.[90] The Court of Appeals for the Ninth Circuit agreed, holding that a contractual action would dispose of the German action since a future FRAND license would cover Motorola's worldwide SEP portfolio.[91] The impact on comity was found to be tolerable because the AEI was limited in scope.[92] It only prohibited Motorola from enforcing its German patent injunction but did "not otherwise affect Motorola's ability to pursue its German patent claims against Microsoft."[93] The fact that both parties were U.S. corporations and the U.S. action was filed before the German one supported the conclusion that the impact on comity was tolerable.[94]

*Huawei v. Samsung* was another case resulting in an AEI. After cross-licensing negotiations failed, Huawei sued Samsung in the United States for the infringement of its SEPs, requesting the court to declare that Samsung breached its FRAND commitment and to set the terms and conditions of a

---

[84] *Id.* at *11.

[85] *Id.*

[86] Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 889 (9th Cir. 2012).

[87] *Id.* at 878.

[88] *Id.* at 878–79.

[89] *Id.* at 879.

[90] *Id.* at 880.

[91] *Id.* at 884–85.

[92] *Id.* at 888.

[93] *Id.* at 881.

[94] *Id.* at 888.

global FRAND cross-license.[95] One day later, Huawei filed patent infringement actions in China.[96] Again, foreign litigation proceeded faster than the U.S. proceedings. The Chinese court found that two of Huawei's SEPs had been infringed and that Huawei had complied with its FRAND commitment while Samsung "seriously delayed the negotiations and clearly violated FRAND principles."[97] Consequently, the Chinese court enjoined Samsung from manufacturing and selling its 4G smartphones in China.[98] Samsung appealed and, at the same time, asked the U.S. court to enter an AEI preventing Huawei from enforcing the Chinese injunction.[99] Judge Orrick from the U.S. District Court for the Northern District of California agreed and granted an AEI.[100] As in *Microsoft v. Motorola*, he held that a breach of contract action and determination of global FRAND licensing terms disposed of the Chinese action.[101] Moreover, he was concerned with the risk of inconsistent judgments and harm to Samsung, which would force it to accept Huawei's licensing terms before any court had the opportunity to adjudicate the breach of contract claim.[102] As for comity concerns, Judge Orrick considered it tolerable because the U.S. action was filed first (although by just one day) and the scope of the AEI was limited.[103] It related only to the prohibition of enforcement of the Chinese injunction, did not impact other patent claims, and would last only until the U.S. court had the opportunity to adjudicate the case (which was estimated to be less than six months).[104]

    In other cases, U.S. courts have refused to grant full ASIs prohibiting parallel litigation abroad. In *Vringo v. ZTE*, ZTE brought an antitrust action against Vringo in China using confidential licensing information obtained from the non-disclosure agreement ("NDA") signed with Vringo.[105] In response, Vringo sued for the breach of the NDA in the United States and sought an ASI against ZTE to withdraw its antitrust case and prohibit it from further pursuing the same or similar antitrust claims.[106] The court denied the ASI request, holding that the U.S. proceedings regarding the breach of the

---

[95]   Huawei Techs., Co. v. Samsung Elecs. Co., No. 16-cv-02787, 2018 WL 1784065, at *2 (N.D. Cal. Apr. 13, 2018), *vacated*, No. 16-cv-02787, 2019 WL 3369748 (N.D. Cal. Mar. 21, 2019).

[96]   *Id.*

[97]   *Id.* at *3.

[98]   *Id.*

[99]   *Id.*

[100]  *Id.* at *12.

[101]  *Id.* at *8–9.

[102]  *Id.* at *10.

[103]  *Id.* at *12.

[104]  *Id.*

[105]  Vringo, Inc. v. ZTE Corp., No. 14-cv-4988, 2015 WL 3498634, at *2–3 (S.D.N.Y. June 3, 2015).

[106]  *Id.* at *3.

NDA were not the same as the Chinese claims and would not dispose of the antitrust action in China.[107]

In *Apple v. Qualcomm,* Judge Curiel from the U.S. District Court for the Southern District of California also denied an ASI.[108] After failed SEP licensing negotiations, Apple brought an action in the district court alleging breach of contract, patent invalidity and non-infringement, and antitrust violation.[109] Apple also filed lawsuits against Qualcomm in the UK, Japan, China, and Taiwan similarly alleging invalidity and non-infringement of national SEPs and violation of local competition laws.[110] Qualcomm asked for an ASI prohibiting Apple from pursuing all foreign actions and from filing any other foreign suits during the pendency of the U.S. case.[111] According to Qualcomm, the essence of the dispute was whether Qualcomm's royalties were FRAND and whether Qualcomm had satisfied its global FRAND commitment to Apple.[112] However, the court disagreed. It held that even if Qualcomm offered a license on FRAND terms, Apple was not obliged to accept it.[113] Thus, the court considered that Apple had not contracted away its right to ask foreign courts for declarations of invalidity, non-infringement, or exhaustion of Qualcomm's foreign SEPs.[114] Moreover, the impact on comity was held to be intolerable. Even if the U.S. court determined FRAND royalty terms, that would not dispose of the foreign antitrust cases. The court found that enjoining Apple from proceeding with its foreign suits "would effectively deprive the UK, China, Japan, and Taiwan of its jurisdiction to consider whether licensing agreements that Qualcomm executes within those jurisdictions, have anticompetitive effects in those territories."[115]

*Optis v. Huawei* was another case where an ASI was denied. PanOptis brought suit against Huawei in the U.S. District Court for the Eastern District of Texas for the infringement of its SEPs, while Huawei alleged that PanOptis breached its FRAND commitment.[116] Huawei additionally sued PanOptis in China, claiming breach of contract and antitrust violations, asking the court

---

[107]   *Id.* at *11.

[108]   Apple Inc. v. Qualcomm Inc., No. 17-cv-00108, 2017 WL 3966944, at *1 (S.D. Cal. Sept. 7, 2017).

[109]   *Id.* at *1, *3.

[110]   *Id.* at *4–5.

[111]   *Id.* at *5.

[112]   *Id.*

[113]   *Id.* at *12.

[114]   *Id.*

[115]   *Id.* at *18.

[116]   Optis Wireless Tech., LLC v. Huawei Techs. Co., No. 17-cv-00123, 2018 WL 3375192, at *1, *8 (E.D. Tex. July 11, 2018).

to set the FRAND royalty rate for PanOptis' Chinese patents.[117] PanOptis then requested an ASI from the U.S. court to enjoin Huawei from pursuing actions in China.[118] The ASI was denied because the Chinese and U.S. actions were held to be different and the U.S. case would not dispose of the Chinese one.[119] Namely, the U.S. case dealt with U.S. patents and Huawei's FRAND defense, while the Chinese action related to Chinese patents.[120] Although "there may be similar factual disputes," the "scope of any relief awarded by this court or the Chinese court extends only as far as jurisdiction allows."[121]

Therefore, courts in the United States have been reluctant to grant wide ASIs to date and have limited themselves only to AEIs. The present experience demonstrates that AEIs would only be considered against a foreign patent injunction under strict conditions. Although the two cases where AEIs were granted followed the "liberal" approach, even they carefully weighed the impact on comity.[122] As a result, U.S. courts have not been willing to generally prohibit SEP litigation from continuing in parallel jurisdictions.

B.   *Europe*

European courts are reluctant to order ASIs interfering with parallel foreign proceedings but are willing to protect their own jurisdictions against foreign ASIs by granting AASIs.[123]

---

[117] *Lian Pingguo Dou Ceng Baibei de "Zhuanli Liumang" Gongsi, Bei Huawei Gao Yingle, Bing Suopei Jin 1 Yi* (连苹果都曾败北的 "专利流氓" 公司，被华为告赢了，并索赔近1亿) [*A Company Known as a "Patent Troll" That Has Even Defeated Apple Has Been Defeated by Huawei and Ordered to Pay Nearly RMB 100 Million in Settlement/Compensation*], IPR DAILY (Aug. 29, 2021), https://perma.cc/94L6-NNMF.

[118] Report and Recommendation at 1, Optis Wireless Tech., LLC v. Huawei Techs. Co., No. 17-cv-00123 (E.D. Tex. Apr. 24, 2018), ECF No. 137 (R&R adopted by district court without opinion on May 15, 2018, ECF No. 149).

[119] *Id.* at 2.

[120] *Id.*

[121] *Id.*

[122] *See* Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 886 (9th Cir. 2012); Huawei Techs., Co. v. Samsung Elecs. Co., No. 16-cv-02787, 2018 WL 1784065, at *11 (N.D. Cal. Apr. 13, 2018), *vacated*, No. 16-cv-02787, 2019 WL 3369748 (N.D. Cal. Mar. 21, 2019).

[123] *Compare* Essar Shipping Ltd. v. Bank of China Ltd. [2015] EWHC (Comm) 3266 (Eng.), *with* IPCom v. Lenovo [2019] EWHC (Pat) 3030 [60] (Eng.).

**Table 3: European SEP Cases Involving ASIs or AASIs**

| AASI granted | AASI refused |
|---|---|
| *Conversant v. Huawei and ZTE* (UK 2018)[124] | *Ericsson v. Apple* (Neth. 2021)[125] |
| *IPCom v. Lenovo* (UK 2019)[126] | *GE Video and Mitsubishi v. Xiaomi* (Ger. 2022)[127] |
| *IPCom v. Lenovo* (Fr. 2019)[128] | |
| *Nokia v. Continental* (Ger. 2019)[129] | |
| *InterDigital v. Xiaomi* (Ger. 2021)[130] | |
| *IP Bridge v. Huawei* (Ger. 2021)[131] | |

In the *Conversant v. Huawei and ZTE* case in the UK, Conversant sued for infringement and requested the court to set FRAND terms for its global SEP portfolio.[132] Subsequently, ZTE initiated proceedings before the Shenzhen court in China, where it asked the court to determine a FRAND rate for Conversant's Chinese SEPs and requested an ASI to restrain Conversant from pursuing the UK proceedings.[133] In response, Conversant sought an AASI in the UK to prohibit ZTE from prosecuting conflicting claims in China.[134] ZTE eventually agreed to withdraw its ASI request in China, which would have given rise to an ASI in the UK.[135] The UK court considered ZTE's

---

124    [2018] EWHC (Ch) 2549 (Eng.).

125    Rb. Den Haag 16 december 2021, ECLI:NL:RBDHA:2021:13881 (Telefonaktiebolaget LM Ericsson/Apple Retail Netherlands B.V.) (Neth.).

126    [2019] EWHC (Pat) 3030 (Eng.).

127    Oberlandesgericht Düsseldorf [OLG] [Higher Regional Court of Düsseldorf] Feb. 7, 2022, 2 U 25/21 (Ger.).

128    Tribunaux de grande instance [TGI] [ordinary court of original jurisdiction] Paris, Nov. 8, 2019, 19/59311 (Fr.).

129    Landgericht München [LG] [Munich Regional Court] Oct. 2, 2019, 21 O 9333/19 (Ger.).

130    Landgericht München [LG] [Munich Regional Court] Feb. 25, 2021, 7 O 14276/20 (Ger.).

131    Landgericht München [LG] [Munich Regional Court] June 24, 2021, 7 O 36/21 (Ger.).

132    Conversant Wireless Licensing S.A.R.L. v. Huawei Techs. Co. [2018] EWHC (Ch) 2549 [7] (Eng.).

133    *Id.* at [10]–[12].

134    Justice Henry Carr talks about granting an 'anti-suit injunction' but effectively it is an 'anti-anti suit injunction' targeted against foreign ASIs. *Id.* at [24].

135    *Id.*

request in China for an ASI to be vexatious as it could have had the effect of obstructing pending proceedings before the English court.[136]

The UK and French courts in the respective *IPCom v. Lenovo* cases issued AASIs barring Lenovo from seeking an ASI from a U.S. court.[137] IPCom and Lenovo had been unsuccessfully negotiating for years over a FRAND license when Lenovo brought an action before the U.S. court seeking declarations of non-infringement, alleging a breach of the FRAND commitment, and requesting a subsequent determination of global FRAND terms.[138] In response, IPCom initiated patent infringement litigation in the UK and France, while Lenovo asked the U.S. court to enter an ASI barring IPCom from litigating its SEPs until the U.S. action was resolved.[139] IPCom then moved for an AASI to protect the UK and French proceedings.[140] The UK court noted that "it would be vexatious and oppressive to IPCom if it were deprived entirely of its right to litigate infringement and validity" of its SEPs.[141] The principle of comity would not be significantly infringed as an AASI would "in no way interfere with the bulk of the issues before the U.S. court."[142] Thus, the UK court enjoined Lenovo's UK group of companies from assisting the U.S. ASI motion directed at preventing the UK proceedings.[143] In France, the Court of Paris said that foreign ASIs are generally against public order, except in limited circumstances when they are aimed at complying with arbitration or choice of jurisdiction contractual clauses.[144] The court observed that in this specific case, the U.S. ASI would infringe on IPCom's fundamental rights, such as the rights to property, a fair trial, and the opportunity to be heard by a judge.[145] Consequently, the Court of Paris issued an AASI ordering Lenovo to withdraw its U.S. ASI request directed at French proceedings and not to file any new ASIs.[146]

---

[136] *Id.* at [24].

[137] IPCom GMBH & Co. v. Lenovo Tech. (UK) Ltd. [2019] EWHC (Pat) 3030 (Eng.); Tribunaux de grande instance [TGI] [ordinary court of original jurisdiction] Paris, Nov. 8, 2019, 19/59311 (Fr.).

[138] *IPCom GMBH* [2019] EWHC (Pat) 3030 at [5], [7]–[8].

[139] *Id.* at [10]–[11]; Lenovo (U.S.) Inc. v. IPCom GmbH & Co., No. 19-cv-01389, 2019 WL 6771784, at *1 (N.D. Cal. Dec. 12, 2019).

[140] *IPCom GMBH* [2019] EWHC (Pat) 3030 at [15], [18].

[141] *Id.* at [52]–[54].

[142] *Id.* at [58].

[143] *Id.* at [15], [60].

[144] Tribunaux de grande instance [TGI] [ordinary court of original jurisdiction] Paris, Mar. 3, 2020, RG 19/21426 (Fr.); *see also* Enrico Bonadio & Luke McDonagh, *Paris Court Grants an SEP Anti-Anti-Suit Injunction in* IPCom v Lenovo: *A Worrying Decision in Uncertain Times?*, 15 J. INTELL. PROP. L. & Prac. 149, 149 (2020).

[145] Bonadio & McDonagh, *supra* note 144, at 149.

[146] *Id.* at 149–50.

In Germany, the Munich Regional and Higher Regional Courts issued an AASI in *Nokia v. Continental*.[147] The dispute related to licensing SEPs in the automotive industry where Avanci, a patent pool, and Nokia, one of its members, license to car manufacturers.[148] Daimler, a car manufacturer, refused to take a license and pointed to its suppliers as the right licensing counterparties, one of whom was Continental, who produced telematics control units to provide cars with internet connectivity.[149] Eventually, Nokia sued Daimler for patent infringement in Germany and requested an injunction.[150] Meanwhile, Continental brought an action in the U.S. District Court for the Northern District of California alleging that Avanci and its members, including Nokia, violated their FRAND commitments and antitrust laws.[151] Additionally, Continental requested an ASI to enjoin Nokia from prosecuting its lawsuits in Germany against Daimler and from filing additional patent infringement actions against Continental or its customers until the U.S. court first resolved FRAND issues.[152] However, before the U.S. district court decided on an ASI, Nokia requested and obtained an AASI in Germany.[153]

In issuing the AASI, the Munich Regional and Higher Regional Courts reasoned that a foreign ASI is an unlawful interference with a patent owner's property rights, given that it would deprive the SEP owner of the right to enforce the patent before a German court.[154] Accordingly, an AASI is viewed as the only defensive measure available against a foreign ASI and a lawful exercise of the right to self-defense.[155] Thus, the right of the SEP owner to self-defense against an unlawful, tortious measure prevailed over the interest of Continental to preserve its freedom to act.[156]

As can be seen, courts in the UK, France, and Germany take a negative view of foreign ASIs that interfere with their SEP proceedings. Foreign ASIs are considered to violate patent owners' rights to property, patent owners'

---

[147]  Oberlandesgericht München [OLG] [Higher Regional Court of Munich] Dec. 12, 2019, 6 U 5042/19 (Ger.); Landgericht München [LG] [Munich Regional Court] Oct. 2, 2019, 21 O 9333/19 (Ger.).

[148]  Cont'l Auto. Sys., Inc. v. Avanci, LLC, No. 19-cv-02520, 2019 WL 6735604, at *2 (N.D. Cal. Dec. 11, 2019).

[149]  *See* Axel Verhauwen & Joachim Gerstein, *On the Obligation to License Standard Essential Patents in the Supply and Exploitation Chain: Selection Right of the SEP Holder vs. FRAND-Everyone's Right*, 55 LES NOUVELLES 302, 302–03 (2020).

[150]  *Id.*

[151]  Plaintiff's Motion for Anti-Suit Injunction at 20–21, Cont'l Auto. Sys., Inc. v. Avanci, LLC, No. 19-cv-02520, 2019 WL 6735604 (N.D. Cal. Dec. 11, 2019).

[152]  *Id.* at *3.

[153]  Landegericht München [LG] [Munich Regional Court] Oct. 2, 2019, 21 O 9333/19 (Ger.).

[154]  *Id.* ¶ 16.

[155]  *Id.* ¶¶ 55–56, 61, 67.

[156]  *Id.* ¶¶ 58–59, 89.

access to justice, and effective judicial protection guaranteed by the European Charter on Human Rights,[157] the European Convention on Human Rights,[158] and national constitutions. As a result, European courts have used AASIs as a defensive measure to protect the rights of patent owners, to enforce national patents, and to safeguard their own jurisdictions. At the same time, they have refrained from granting offensive ASIs against parallel foreign proceedings.

C.   *China*

Chinese courts have recently started issuing ASIs to secure their jurisdiction in global SEP litigation.[159] Two opposing trends may be observed. In one case, a narrow AEI was ordered that resembles AEIs awarded by U.S. courts and appears to mirror the U.S. criteria for the grant of ASIs.[160] On the other hand, in two other cases courts granted very wide ASIs that effectively prohibited any ongoing and future patent and FRAND royalty litigation anywhere in the world.[161] The latter line of cases does not appear to correspond with existing international practices and has created an international backlash.

---

[157]   Charter 326/391 of Fundamental Rights of the European Union, 2012 O.J. (C 326) 2, art. 17, 47.

[158]   European Convention on Human Rights art. 13, Rome 4.XI.1950, https://perma.cc/WG82-AU35; Protocol to the European Convention on Human Rights art. 1, Paris 20.III.1952, https://perma.cc/JRA8-NYVN.

[159]   *See* Huawei Jishu Youxian Gongsi Su Kang Wensen Wuxian Xuke Youxian Gongsi (华为技术有限公司诉康文森无线许可有限公司) [Huawei Techs. Co. v. Conversant Wireless Licensing S.A.R.L.], 2019 Zui Gao Fa Zhi Min Zhong No. 732, 733, 734 (Sup. People's Ct. Aug. 28, 2020) (China) [hereinafter *Huawei* (SPC)]"

[160]   *Id.*

[161]   Xiaomi Tongxun Jishu Gongsi Su Jiaohu Shuzi Gongsi (小米通讯技术公司诉交互数字公司) [Xiaomi Commc'n Tech. Co. v. InterDigital Tech. Corp.], 2020 E 01 Zhi Min Chu. No. 169-1 (Wuhan Interm. People's Ct. Sept. 23, 2020) (China) [hereinafter *Xiaomi* (Wuhan IPC)]; *See* Sanxing Dianzi Zhushi Huishe Su Ailixin Shuzi Gongsi (三星电子株式会诉爱立信公司) [Samsung Elecs. Co. v. Telefonaktienbolaget LM Ericsson], E 01 Zhi Min Chu No. 743 (Wuhan Interm. People's Ct. Dec. 25, 2020) (China) [hereinafter *Samsung* (Wuhan IPC)].

**Table 4: Chinese SEP Cases Involving AEIs or ASIs**

| AEI | ASI |
|---|---|
| *Huawei v. Conversant* (2020)[162] | *Oppo v. Sharp* (2020)[163] |
| | *Xiaomi v. InterDigital* (2020)[164] |
| | *Samsung v. Ericsson* (2020)[165] |

　　*Huawei v. Conversant* represents the first approach of granting a narrower AEI. After failed SEP licensing negotiations, Huawei sued Conversant in China, requesting declarations of non-infringement for three SEPs and, if it did infringe, a determination of FRAND royalty for Chinese SEPs.[166] A few months later, Conversant sued Huawei in Germany for patent infringement under the equivalent German SEPs and successfully obtained a first-instance injunction before the final ruling in China.[167] The Dusseldorf Regional Court found that the German SEPs were infringed and that Conversant's licensing offer was FRAND.[168] In China, while the case was under appeal to the Supreme People's Court of China ("SPC"), Huawei requested an "act of preservation," prohibiting Conversant from enforcing its German injunction before final judgment in the Chinese proceedings.[169]

　　The SPC first outlined the rules for granting ASIs. The legal test includes the assessment of five criteria: (1) the effect of enforcement of a foreign judgment on Chinese proceedings; (2) the necessity of adopting an ASI; (3) a reasonable balance of interest between the parties; (4) the impact of an

---

　　162　Huawei Jishu Youxian Gongsi Su Kang Wensen Wuxian Xuke Youxian Gongsi (华为技术有限公司诉康文森无线许可有限公司) [Huawei Techs. Co. v. Conversant Wireless Licensing S.A.R.L.], 2019 Zui Gao Fa Zhi Min Zhong No. 732, 733, 734 (Sup. People's Ct. Aug. 28, 2020) (China).

　　163　Xiapu Zhusi Huishe Su OPPO Guangdong Yidong Tongxin Youxian Gongsi (夏普株式会社诉OPPO广东移动通信有限公司) [Sharp Corp. v. OPPO Guangdong Mobile Telecomms. Co.] 2020 Zuigao Fa Zhi Min Xia Zhong No. 517 (Sup. People's Ct. Aug. 19, 2021) [hereinafter *Oppo* (SPC)].

　　164　Xiaomi Tongxun Jishu Gongsi Su Jiaohu Shuzi Gongsi (小米通讯技术公司诉交互数字公司) [Xiaomi Commc'n Tech. Co. v. InterDigital Tech. Corp.], 2020 E 01 Zhi Min Chu. No. 169-1 (Wuhan Interm. People's Ct. Sept. 23, 2020) (China).

　　165　Sanxing Dianzi Zhushi Huishe Su Ailixin Shuzi Gongsi (三星电子株式会社诉爱立信公司) [Samsung Elecs. Co. v. Telefonaktiebolaget LM Ericsson], E 01 Zhi Min Chu No. 743 (Wuhan Interm. People's Ct. Dec. 25, 2020) (China) [hereinafter *Samsung* (Wuhan IPC)].

　　166　*Huawei* (SPC), *supra* note 159.

　　167　Landgericht Düsseldorf [LG] [Düsseldorf Regional Court] Aug. 27, 2020, 4b O 30/18, D-Prax (Ger.), https://perma.cc/SL6T-4GRZ.

　　168　*Huawei* (SPC), *supra* note 159.

　　169　*Id.*

ASI on the public interest; and (5) the impact of an ASI on international comity.[170] These factors appear to resemble those used in the United States.

The SPC found all the criteria fulfilled in this case.[171] Namely, in consequence of the German injunction, Huawei was said to have only two options: either be forced to accept an injunction and withdraw from the German market or be forced to settle on terms that were 18.3 times higher than the SEP licensing rate for Chinese SEPs determined in the Chinese case.[172] In the view of the SPC, a German injunction would realistically interfere with Chinese proceedings and render its judgment meaningless.[173] It would also cause irreparable damage to Huawei.[174] The SPC found any impact on comity tolerable because the Chinese case was initiated before the German one, and an AEI would not affect subsequent trials in Germany on the appeal concerning validity of the SEPs.[175] Thus, the SPC ordered an AEI prohibiting Conversant from enforcing its German injunction with a daily penalty of around €135,000 for non-compliance.[176]

*Oppo v. Sharp* appears to be the first case in the world where a full ASI was granted prohibiting parallel patent litigation without the express consent of the parties. Sharp first filed a patent infringement suit in Japan, while Oppo brought an action in China asking the court to set a global FRAND rate for Sharp's SEPs.[177] Oppo also requested an ASI, which the Intermediate People's Court of Shenzhen granted.[178] The ASI prohibited Sharp from filing new patent infringement suits on its SEPs against Oppo in other countries.[179] A daily fine for non-compliance was set at around €135,000.[180]

The third line of cases witnessed the grant of extremely wide ASIs. In *Xiaomi v. InterDigital*, Xiaomi sued InterDigital before the Wuhan Intermediate People's Court ("IPC") and requested the determination of

---

170  *Id.*

171  *Id.*

172  *Id.*

173  *Id.*

174  *Id.*

175  *Id.*

176  *Id.* (assessing a daily fine of RMB one million).

177  *Oppo* (SPC), *supra* note 163; *see also* Aaron Wininger, *China's Supreme People's Court Affirms Right to Set Royalty Rates Worldwide in OPPO/Sharp Standard Essential Patent Case*, CHINA IP L. UPDATE (Sept. 5, 2022), https://perma.cc/RTG4-36AW.

178  *Oppo* (SPC), *supra* note 163; *see also China's Top 20 Patent Cases of 2020: Oppo v. Sharp*, CHINA INTELL. PROP. MAG. (June 2021), https://perma.cc/C6EA-3HL3.

179  *Id.*

180  *Id.*

global FRAND royalty terms for InterDigital's portfolio of SEPs.[181] InterDigital retaliated by suing in India for patent infringement and seeking damages and an injunction.[182] In response, Xiaomi asked the Wuhan IPC for an ASI against InterDigital.[183] When granting an ASI, the Wuhan court considered that InterDigital's parallel suit in India expressed a lack of respect for Chinese proceedings and was intended to interfere and obstruct the present case.[184] The court was also concerned that parallel proceedings would lead to conflicting rulings and that a potential Indian patent injunction would make Chinese judgment difficult to enforce.[185] Moreover, an injunction in India would allegedly cause irreparable damage to Xiaomi, while InterDigital as a non-practicing entity would not be significantly harmed except for a delay in obtaining a legal remedy.[186] The Wuhan IPC then ordered InterDigital to: (1) immediately withdraw or suspend injunction proceedings against Xiaomi in India; (2) not seek an injunction against Xiaomi in China or any other country for infringement of its SEPs; and (3) not request from any other court in the world the determination of SEP royalty terms.[187] A daily penalty of around €135,000 was fixed for non-compliance with the ASI.[188]

A few months later, an even wider ASI was issued by the Wuhan IPC in *Samsung v. Ericsson*.[189] After failed negotiations on the renewal of a global cross-licensing agreement, Samsung filed a suit before the Wuhan court, asking for the determination of global FRAND licensing terms.[190] Unaware of the Chinese action, Ericsson sued Samsung before the U.S. District Court for the Eastern District of Texas, alleging that Samsung breached its FRAND obligation.[191] A few days later, Samsung retaliated by requesting an ASI, which, without hearing the other party, the Wuhan IPC granted, preventing Ericsson from (1) seeking or enforcing any injunctive relief for infringement of its SEPs before any court, customs offices, or administrative enforcement agencies anywhere in the world; (2) requesting any court anywhere in the world to adjudicate on SEP licensing terms or to determine whether

---

[181] *Xiaomi* (Wuhan IPC), *supra* note 161. For the English translation of the case and discussion, see Yang Yu & Jorge L. Contreras, *Will China's New Anti-Suit Injunctions Shift the Balance of Global FRAND Litigation?*, UTAH L. DIGIT. COMMONS (Dec. 2020), https://perma.cc/W4UT-58GD.

[182] *Xiaomi* (Wuhan IPC), *supra* note 161.

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] *Samsung* (Wuhan IPC), *supra* note 161.

[190] *Id.*

[191] Ericsson Inc. v. Samsung Elecs. Co., No. 20-CV-00380, 2021 WL 89980, at *1–2 (E.D. Tex. Jan. 11, 2021).

Samsung fulfilled its FRAND licensing obligation; and (3) requesting an ASI or AASI anywhere in the world.[192]

The Wuhan IPC reasoned that allowing parallel proceedings to run would impact its own proceedings.[193] A foreign injunction would make the enforcement of its judgment difficult, while a foreign adjudication of FRAND licensing terms might overlap or conflict with its own judgment.[194] In addition, parallel proceedings might cause disproportionate harm to Samsung, while an ASI would allegedly not lead Ericsson to fundamentally lose its patent rights as it would obtain a court-determined FRAND royalty after the proceedings.[195] As to the impact on comity, the Wuhan court argued that it was the first court to accept the dispute between the parties regarding a FRAND royalty rate and that the efficiency of having one court resolve a global licensing dispute between the parties favors wide ASIs.[196]

The scope of the granted ASIs and the award criteria used by the Wuhan IPC depart from comparable practices in the United States and Europe. While the United States and European counterparts would make an assessment on whether parallel suits are the same, whether they could be disposed of by domestic proceedings, and the impact on comity, no such assessment was performed by the Wuhan court. Instead, it appears that the Wuhan IPC was mainly concerned that foreign litigation might interfere and obstruct its proceedings. Its ASIs are both materially and geographically wider than any terms that could be ordered in the United States and the UK. First, they apply not only to current but to any future suits.[197] Second, they relate not only to the determination of global FRAND rates, which was the issue in the Wuhan proceedings, but also to other forms of action (patent infringement and validity, non-compliance with FRAND commitments, and requests for AASIs).[198] Third, the ASIs were not limited geographically to countries where the SEP owner had brought parallel suits (India and the United States) but encompassed all jurisdictions in the world.[199]

The grant of wide ASIs by Chinese courts can be explained by the perception that foreign courts were increasingly setting global FRAND rates against Chinese companies. Thus, Chinese ASIs may be seen as a defensive measure against foreign interference, as well as a desire for Chinese courts to be the ultimate venue for setting global FRAND rates for Chinese

---

192  *Id.* at *2–3.

193  *Samsung* (Wuhan IPC), *supra* note 161.

194  *Id.*

195  *Id.*

196  *Id.*

197  *See id.*; *Xiaomi* (Wuhan IPC), *supra* note 161

198  *See Samsung* (Wuhan IPC), *supra* note 161; *Xiaomi* (Wuhan IPC), *supra* note 161.

199  *See Samsung* (Wuhan IPC), *supra* note 161; *Xiaomi* (Wuhan IPC), *supra* note 161.

companies. However, approaches by U.S. and European courts are fundamentally different. The U.S. courts have only determined global SEP royalty terms when the parties themselves expressly consented.[200] Where there was no consent, U.S. courts simply awarded damages for litigated valid and infringed SEPs.[201] On the other hand, when deciding whether to grant an injunction for patent infringement, European courts are required by the CJEU's *Huawei v. ZTE* framework to assess whether the SEP owner offered the implementer a FRAND license. In other words, the assessment of FRAND terms is tied with the claim for patent injunction. Thus, if the SEP is found valid and infringed, the implementer may decide to accept a court-verified FRAND license or be subject to a national injunction and leave the market in the country concerned.[202] Consequently, there is a subtle but important difference between a stand-alone request by a prospective licensee to set global FRAND royalty terms (as adopted in China) and the assessment of FRAND terms tied to the injunction stage of a patent infringement claim brought by the owner.

D.  *Responses to Chinese ASIs*

The Wuhan IPC's wide ASIs have not gone unopposed. Ericsson obtained an AASI from the U.S. District Court for the Eastern District of Texas, preventing Samsung from attempting to enforce a Chinese ASI.[203] Judge Gilstrap noted that Wuhan's ASI would frustrate the public interest and ensured that litigation proceeded within its legitimate jurisdiction.[204] The ASI was also held to impose inequitable hardship on Ericsson, which was deprived of its right to bring claims under U.S. law.[205] Interestingly, Judge Gilstrap noted that while both suits might be factually similar, they involved separate legal questions. The Chinese action was related to the determination of global FRAND rates, while the U.S. action concerned whether the conduct of the parties was compliant with their respective FRAND obligations.[206] Given these differences, the Chinese action was not

---

200  Microsoft Corp. v. Motorola, Inc., No. C10-1823, 2013 WL 2111217, at *1 (W.D. Wash. Apr. 25, 2013); TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson, No. SACV 14-341, 2018 WL 4488286, at *1 (C.D. Cal. Sept. 14, 2018), *rev'd in part, vacated in part*, 943 F.3d 1360 (Fed. Cir. 2019).

201  Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201 (Fed. Cir. 2014); *In re* Innovatio IP Ventures, LLC, No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013).

202  *See* Unwired Planet Int'l Ltd v. Huawei Techs. Co. [2017] EWHC (Pat) 2988, [562]–[563] (Eng.).

203  Ericsson Inc. v. Samsung Elecs. Co., No. 20-CV-00380, 2021 WL 89980, at *8 (E.D. Tex. Jan. 11, 2021).

204  *Id.* at *4.

205  *Id.* at *5.

206  *Id.* at *6.

dispositive of the U.S. claims.[207] Finally, international comity was held not to be affected by an AASI.[208] An AASI is targeted only at prohibiting the enforcement of an ASI. The U.S. court was not ordering Samsung to stop prosecuting its claims in China. Rather, the "[c]ourt believe[d] it must act for the targeted purpose of allowing both suits to proceed without interference."[209]

InterDigital also managed to obtain an AASI against Xiaomi in India and Germany.[210] The Delhi High Court expressed similar reservations concerning ASIs as its European counterparts.[211] It was concerned that an ASI would deprive the rights of Indian citizens to have access to justice.[212] The court noted that allowing Wuhan's ASI to proceed would require the SEP owner to "sit back and helplessly watch" as its patents are continuously infringed without being able to "lift a finger to prevent it," rendering the Indian Patents Act "both otiose and impotent."[213] It further stressed that the two cases were of a different nature. The Chinese case concerned the determination of global FRAND royalty terms, while the Delhi High Court was asked to rule on the infringement of SEPs and to decide whether to grant an injunction.[214] The court thus ordered Xiaomi not to enforce its Chinese ASI and, if it did, to pay the same amount of fine that InterDigital would be forced to pay in China for any non-compliance with the ASI.[215]

The Munich Regional Court also ordered an AASI on InterDigital's application, prohibiting Xiaomi from enforcing its Wuhan ASI.[216] It reiterated the concerns that the ASI violated public order and would deprive the patentee of the essential feature of its property rights and the right to access to courts.[217] It ordered Xiaomi to refrain from enforcing the ASI, with the threat of a fine of up to €250,000 or detention of company officials up to six months.[218]

The Munich Regional Court, however, also attempted to put an end to the interference of foreign ASIs and issued guidance for future cases. It stressed that it would not wait for an implementer to file and obtain an ASI

---

207   *Id.* at *4.

208   *Id.* at *7.

209   *Id.*

210   *See* InterDigital Tech. Corp. v. Xiaomi Corp., AIROnline 2021 (Del.) 650 (India); Landgericht München [LG] [Munich Regional Court] Feb. 25, 2021, 7 O 14276/20 (Ger.).

211   *InterDigital*, AIROnline 2021 (Del.) 650, ¶ 104 (India).

212   *Id.* ¶¶ 111–112.

213   *Id.* ¶ 107.

214   *Id.* ¶ 99.

215   *Id.* ¶ 116.

216   Landgericht München [LG] [Munich Regional Court] Feb. 25, 2021, 7 O 14276/20, ¶ D(I) (Ger.).

217   *Id.* ¶ E(I).

218   *Id.* ¶¶ C(I), (I)(2).

before it would grant an AASI.[219] The court reasoned that there may exist a "risk of first infringement" of an SEP owner's property rights even when an ASI has not yet been granted.[220] Accordingly, the court noted that it would preemptively grant an AASI if the implementer has: (1) threatened to file a request for an ASI; (2) filed a request for an ASI; (3) filed an action in countries where ASIs can in principle be granted; (4) already threatened an ASI or filed an ASI against other patent holders, and there is no indication that it would refrain from such actions in the future; or (5) failed to declare in writing within a short deadline set by the patent holder that it will not file a request for an ASI.[221]

The Munich Regional Court continued by holding that an implementer that does not follow the above conditions would be treated as an "unwilling licensee" within the meaning of *Huawei v. ZTE*.[222] In other words, such an implementer would risk an injunction if an SEP was found to be infringed without the examination of *Huawei v. ZTE* criteria, such as the requirement for a FRAND offer by the SEP owner and a counter-offer by the implementer. The justification for such an interpretation is that a truly willing implementer should refrain from actions that would impair the SEP owner's property-like rights, such as filing a request for an ASI.[223] ASIs also prevent the *Huawei v. ZTE* framework from being followed. If the SEP owner notifies the implementer of an infringement, it exposes itself to an application for an ASI which, if granted, would prevent the SEP owner from obtaining an injunction against an unwilling licensee. Moreover, the balance of negotiations between the parties would be harmed by an ASI: if the implementer can initiate patent invalidity actions, so must the patent owner be free to enforce its patents before a court.[224] The court also added that it would entail disproportionately high costs if SEP holders would be expected to preemptively file AASIs in many different jurisdictions to protect against ASIs.[225]

In *IP Bridge v. Huawei*,[226] the Munich Regional Court followed its principles and preemptively entered an AASI because of the implementer's threat to seek an ASI.[227] During negotiations for a license for IP Bridge's SEP portfolio, Huawei mentioned the Chinese SPC's AEI in the *Huawei v.*

---

219  *Id.* ¶ E(II)(4)(b)(dd).

220  *Id.* ¶ E(II)(4)(b)(bb)(2).

221  *See id.* ¶¶ E(I)–(II).

222  *Id.* ¶ 146.

223  *Id.*

224  *Id.* ¶ 148.

225  *Id.* ¶ 146.

226  Landgericht München [LG] [Munich Regional Court] June 24, 2021, 7 O 36/21 (Ger.).

227  *Id.*

*Conversant* case, granted against a German injunction.[228] After failed negotiations, IP Bridge initiated patent infringement proceedings against Huawei in Germany and the UK, while Huawei retaliated by filing a suit in China, asking the court to determine the FRAND royalty rate for IP Bridge's Chinese SEP portfolio.[229] IP Bridge then asked the Munich Regional Court to grant an AASI against Huawei, prohibiting it from filing a motion for ASIs or AEIs in China.[230] The court considered that its criteria for the "risk of first infringement" were fulfilled and granted the AASI.[231] Namely, Huawei's referral at negotiations to an AEI issued by the SPC was considered as a threat to file an AEI or ASI in the future.[232] Moreover, Huawei did not declare at any point that it would refrain from seeking an ASI, even when explicitly asked by IP Bridge[233] or when it initiated proceedings in China, a jurisdiction that has demonstrated willingness to grant ASIs and AEIs.[234]

However, a preemptive AASI was not granted by a Dutch Court nor by the Dusseldorf Higher Regional Court in Germany. In the *Ericsson v. Apple*[235] dispute in the Netherlands, the District Court of the Hague rejected Ericsson's pre-claims for AASIs based on Apple's refusal to pledge not to initiate ASI proceedings in the future.[236] According to the judge, there was no concrete threat or instance of Apple's conduct in the past that could justify the grant of an AASI.[237] And in *GE Video and Mitsubishi v. Xiaomi*,[238] the Dusseldorf Higher Regional Court overturned the Dusseldorf Regional Court's award of a preemptive AASI against Xiaomi due to its refusal to provide information on whether it planned to file an ASI in China.[239] The Dusseldorf Higher Regional Court did not consider it sufficient for an AASI, which is in direct contradiction to the position adopted by the Munich Regional Court.[240]

---

228   *Id.* ¶ 6.

229   *Id.* ¶¶ 15, 17.

230   *Id.* ¶ 25.

231   *Id.* ¶ 42.

232   *Id.* ¶ 45.

233   *Id.* ¶ 52.

234   *Id.* ¶ 53.

235   Rb. Den Haag 18 oktober 2021, C/09/618542 / KG ZA 21-914 (Telefonaktiebolaget LM Ericsson/Apple Retail Netherlands B.V.) (Neth.).

236   *Id.* § 2.5.

237   *Id.*

238   Oberlandesgericht Düsseldorf [OLG] [Higher Regional Court of Düsseldorf] July 2, 2022, 2 U 25/21, (Ger.), https://perma.cc/AHJ7-E5MU.

239   Christina Schulze, *Düsseldorf Second Instance Overturns AASI Against Xiaomi*, JUVE PATENT (Feb. 10, 2022), https://perma.cc/82U9-V2R5.

240   *Id.*

In conclusion, the cases illustrate that courts in the United States, Europe, and Asia alike are unwilling to tolerate extensive foreign ASIs restricting SEP litigation in their jurisdictions. The approach of the Munich Regional Court to order a preemptive AASI, even against potential ASIs, and to hold an implementer as an unwilling licensee if it seeks an ASI may discourage any future requests for this remedy because of the importance of the German market.

## IV.    How Courts May Stop Global Jurisdictional Battles

A global race to secure an ASI at the most favorable court and then a subsequent retaliation with an AASI is undesirable from a social and private perspective. Parties in non-compliance with an ASI or AASI may be subject to monetary fines and the imprisonment of company officials, which may lead to an absurd situation where both parties would have to pay fines and company executives would be imprisoned in a commercial licensing dispute. This also creates legal uncertainty as to which court will be competent to hear the case and wastes private and judicial resources. To avoid this outcome, courts could consider using several measures that may put an end to destructive jurisdictional strategies in SEP disputes.

### A.    Judicial Restraint

Courts should exercise judicial restraint and return to the originally strict criteria for the granting of ASIs. ASIs are an exceptional remedy used only (1) in strictly limited circumstances, and (2) where they do not appreciably impact international comity.[241] In SEP cases, comity is always impacted as an ASI prevents the enforcement of national patents before the only competent court—the court in the country in which the patents have been granted. In the UK, the principle is that "[t]he stronger the connection of the foreign courts with the parties and the subject matter of the dispute, the stronger the argument against intervention."[242] Given that a national patent can only be enforced and examined by a national court, a necessary connection with the foreign court examining the request for an ASI would scarcely be present. Even the U.S. courts have not yet granted a full ASI and have been mindful of international comity. This is especially true for courts following the "conservative approach," which places greater emphasis on international comity and makes a presumption in favor of concurrent

---

[241]    *See* Jorge L. Contreras, *Anti-Suit Injunctions and Jurisdictional Competition in Global Grand Litigation: The Case for Judicial Restraint*, 11 N.Y.U. J. Intell. Prop. & Ent. L. 171, 175 (2021).

[242]    Highland Crusader Offshore Partners LP v. Deutsche Bank AG [2009] EWCA (Civ) 725, [50] (appeal taken from EWHC (Comm)).

jurisdiction.[243] The requesting party has a heavy burden to establish that equitable factors and strong public policy concerns would justify the granting of this remedy.[244] Even the courts following the "liberal approach" have also placed due weight on international comity, as seen in *Microsoft v. Motorola* and *Huawei v. Samsung*.[245] Additional arguments for judicial restraint include the impact on fundamental rights to property, access to justice, and effective judicial protection. As has been seen, European as well as Indian courts have refused to comply with foreign ASIs, finding that the use of such a remedy would restrict the right to access the court and to enforce national patent rights. Therefore, as a general rule, ASIs preventing foreign SEP litigation should not be granted.

However, a limited exception may be possible for AEIs. They have a narrower impact on comity since they do not stop foreign litigation but are targeted only at the enforcement of the foreign judgment until the case is resolved by the issuing court.[246] As such, it might be possible to use them especially when a foreign patent injunction would impact a domestic case that has a stronger connection with the parties than a foreign one. Nevertheless, the concern with AEIs is that they may drag down the litigation until the slowest court makes a decision. Implementers may abuse this remedy to intentionally delay litigation. Additionally, since AEIs last only until the issuing court arrives at a judgment, this may result in having two (or more) enforceable judgments at the same time.

Therefore, even an anti-enforcement injunction should be awarded only sparingly and in the rarest of circumstances. Key factors in its award should be: (1) a strong connection with the issuing court (such as domestic parties); (2) where foreign proceedings are obviously frivolous and vexatious; and (3) the proceedings will be of short duration (i.e., the proceedings before the issuing court must be concluded within a reasonable time period).

---

[243] *See supra* text accompanying note 43.

[244] *See* Connor Cohen, *Foreign Antisuit Injunctions and the Settlement Effect*, 116 Nw. U. L. Rev. 1577, 1595 (2022).

[245] *See* Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 889 (9th Cir. 2012); Huawei Techs. Co. v. Samsung Elecs. Co., No. 16-cv-02787, 2018 WL 1784065, at *11 (N.D. Cal. Apr. 13, 2018), *vacated*, No. 16-cv-02787, 2019 WL 3369748 (N.D. Cal. Mar. 21, 2019).

[246] *But see* Landgericht München [LG] [Munich Regional Court] June 24, 2021, 7 O 36/21, ¶ 45 (Ger.) (holding that AEIs impact comity and the SEP owner's right to access to justice even more strongly than ASIs, since they are directed against court decisions which have established both infringement and the existence of a claim for injunctive relief).

B.   *An ASI as a Sign of "Unwillingness to License"*

The innovative approach of the Munich Regional Court in holding companies that request ASIs as an "unwilling licensee" or "unwilling licensor" under the *Huawei v. ZTE* framework could be more widely applied.[247] The result of such an approach is that an implementer seeking a foreign ASI would risk an injunction in the EU without the examination of other *Huawei v. ZTE* criteria if patent infringement is established. Conversely, an injunction could be denied for the SEP owner who pursues a strategy of seeking ASIs abroad. Similar approaches in the assessment of patent injunctions could be implemented in other jurisdictions as well, which would act as a further deterrent to parties not to seek this type of remedy. However, a distinction should be maintained between ASIs and AEIs. There may still be legitimate reasons to grant an AEI in limited circumstances, and requests for such a remedy should not be treated as giving rise to a presumption of unwillingness.

C.   *Focus on the Negotiating Conduct of the Parties*

If courts stopped granting ASIs, then a question still remains: Which court should be competent to resolve SEP disputes and determine global FRAND licensing terms? It may be possible to envisage a situation where a court in one jurisdiction grants an injunction (unless the implementer accepts court-verified FRAND terms) and, at the same time, a court in another country directly sets FRAND licensing terms. There may be two (or more) competing judgments imposing different FRAND licensing terms.

While a court must rule on FRAND licensing terms if a party raises such a claim and the court is legally competent to do so, it may be questionable from a policy perspective for any court to directly set royalties in the absence of the express agreement of the parties. For one, royalty calculations place courts as technology price regulators, which is not their natural role. Such a

---

[247]   Case C-170/13, Huawei Techs. Co. v. ZTE Corp., ECLI:EU:C:2015:477 (July 16, 2015). The *Huawei v. ZTE* framework includes the following steps: (1) Before seeking an injunction, the SEP holder must approach and notify the implementer about infringement and designate specific SEPs that are infringed and the way they are infringed; (2) The infringer should express its willingness to conclude the licensing agreement; (3) The SEP holder should then provide the specific, written offer for a license on FRAND terms, specifying, in particular, the amount of the royalty and the way in which it is to be calculated; (4) The infringer must then diligently and in good faith respond to the offer, without any delaying tactics. If the infringer does not accept, it must submit promptly and in writing its FRAND counter-offer; (5) If the SEP holder rejects the counter-offer, the infringer must provide appropriate security (for example, by providing a bank guarantee or placing necessary amounts on deposit) and render accounts; and 6) At that point, the parties may by common agreement request the FRAND royalty to be determined by an independent third party (presumably court or arbitration). *Id.* ¶¶ 61–68.

task is better left to the market since technology prices are sensitive and prone to quick change. Moreover, making a mistake on FRAND determinations may seriously harm innovation incentives and the capability of a firm to further innovate in next-generation technologies. Next, the purpose of a FRAND licensing commitment is to give parties the flexibility to adapt the terms of the license that best suits their interests.[248] The precise FRAND licensing terms are expected to be set in good-faith negotiations. And finally, even determining the royalty would not solve the SEP licensing dispute, as other terms will still need to be negotiated, such as cross-licensing provisions, the status of grant-backs, monitoring the compliance with royalty payments, the possibility of audits, and so on.

Instead of royalties, a focus of the inquiry could be on the negotiating behavior of the parties. By providing guidelines on good faith licensing conduct, courts may incentivize parties to reach licensing agreements on their own or, at a minimum, reduce the number of disputes. Parties would know in advance how to act, increasing the chance of voluntarily reaching an agreement. Another advantage of such an approach is that the exact specification of FRAND rates would be left to market-based bilateral negotiations, while courts would not have to get directly involved in technology price setting.

International practice on good faith negotiating conduct is slowly emerging. A good example is the *Huawei v. ZTE* framework in Europe, which has now been clarified with extensive national case law.[249] For instance, German courts have ruled that a large number of licenses granted based on a standard licensing agreement provide a strong indication that offered licensing terms are FRAND[250] and that a global portfolio licensing offer is FRAND.[251] In addition, an SEP user must clearly and unambiguously declare willingness to sign a license on FRAND terms and engage in licensing negotiations in a target-oriented manner.[252] The Beijing and Guangdong High People's Courts published guidelines providing a list of "faulty" behavior during licensing negotiations.[253] A faulty behavior on the side of the SEP

---

[248] Nikolic, *supra* note 8, at 59–61.

[249] Landgericht Düsseldorf [LG] [Düsseldorf Regional Court] Sept. 11, 2018, 4a O 17/17 ¶ 326 (Ger.).

[250] *Id.* ¶ 83.

[251] *See* Bundesgerichtshof [BGH] [Federal Court of Justice] May 5, 2020, KZR 36/17 ¶ 78 (Ger.), https://perma.cc/9663-X6JC; Landgericht Mannheim [LG] [Mannheim Regional Court] Jan. 8, 2016, 7 O 96/14 (Ger.); Landgericht Düsseldorf [LG] [Düsseldorf Regional Court] Mar. 31, 2016, 4a O 73/14 ¶ 313 (Ger.).

[252] *See* BGH [Federal Court of Justice] May 5, 2020, KZR 36/17 ¶ 83 (Ger.); Landgericht München [LG] [Munich Regional Court] Oct. 23, 2020, 21 O 11384/19 ¶ 149 (Ger.).

[253] Zhuanli Qinquan Panding Zhinan (2017) (专利侵权判定指南 (2017)) [Guidelines for Patent Infringement Determination (2017)] (promulgated by Beijing High People's Ct., Apr. 20, 2017), https://perma.cc/SL3X-BCS5; *Guanyu Shenli Biaozhun Biyao Zhuanli Jiufen Anjian Gongzuo Zhiyin*

owner, for example, would be if it failed to send a negotiation notification to the implementer or did not provide a sample patent list, claim charts, licensing terms, or royalty-calculation method. On the other hand, the implementer's faulty behavior could include a failure to respond to the SEP owner's licensing negotiation notification and other correspondence within a reasonable time, unjustifiable refusal to enter into a non-disclosure agreement, or a proposal of obviously non-FRAND licensing terms. The Japanese Patent Office also provided a Guide to Licensing Negotiations Involving SEPs.[254]

The assessment of the negotiating conduct comes via different procedural routes. One way is to tie it with the decision on the grant of an injunction for the infringement of SEPs (as is the practice in Europe). Another option is to initiate a standalone claim if permitted by local rules. The patent injunction action can only be initiated by SEP owners, while standalone claims could be launched by implementers. Thus, both parties could file actions that would enable courts to assess their negotiating conduct.

Admittedly, focusing on the negotiating behavior would not be a universal solution that would resolve all disputes. There will still be genuine cases where parties, despite best efforts, cannot agree on the appropriate royalty or other licensing terms. In such instances, a direct determination of FRAND royalties by a court may be required. Nevertheless, good faith licensing negotiations could reduce the number of current disputes and provide clarity, legal certainty, and transparency of the rights and obligations of the parties during the negotiating process.

### Conclusion

The use of ASIs in SEP licensing disputes is controversial. While having one court resolve a global FRAND licensing dispute is ideal from the perspective of the efficient management of judicial resources and litigation cost savings, ASIs are incompatible with patent owners' fundamental rights to property and access to courts. From the international comity perspective, ASIs exclude other courts from hearing their own national patent cases, where they are the only competent forum.

An analysis of existing decisions shows that the United States and Europe grant ASIs in very few cases and with limited scope. In fact, U.S. courts to date issued AEIs in only in two instances. European courts are

---

*(Shixing)* (關於審理通信領域標準必要專利專利糾紛案件工作指引（試行）) [*Working Guideline on the Trial of Standard Essential Patent Dispute Cases (for Trial Implementation)*] (promulgated by Guangdong High People's Ct., Apr. 26, 2018), IPR Daily (May 2, 2018), https://perma.cc/W73Z-G89N.

254    *See generally* Japan Patent Office, Guide to Licensing Negotiations Involving Standard Essential Patents (2d ed. 2022), https://perma.cc/34SF-SGTJ.

reluctant to interfere with foreign proceedings and have not issued ASIs, but they are ready to protect their jurisdiction against foreign intrusion by corresponding AASIs. Chinese courts initially mirrored the U.S. approach with AEIs but have recently changed course and granted wider ASIs prohibiting any existing and future patent or FRAND royalty litigation anywhere in the world. Such an approach has led to international criticism and a potential dispute with the EU and the United States before the WTO.

Three principles have been suggested in this article that may help put an end to global jurisdictional battles. First, courts should exercise judicial restraint and get back to original strict requirements before granting ASIs. As a rule, ASIs should not be available in SEP litigation, as they represent significant interference with international comity, the patent owner's fundamental right to property, and access to courts. Second, courts should hold a party seeking an ASI as "unwilling to license," risking an injunction for the implementer or refusal of injunction for the SEP owner. This would act as a strong deterrent to the parties requesting ASIs. Third, courts should focus more on assessing the conduct of the parties during good faith licensing negotiations, rather than directly setting FRAND royalties. This way, courts avoid being drawn into regulation of technology prices, while providing parties with a framework and certainty during the negotiating process. It may help reduce the number of disputes or at least bring the opposing positions on appropriate FRAND licensing terms closer together.