IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-00569-BO

| | |
|---|---|
| TELEFONAKTIEBOLAGET LM ERICSSON | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| LENOVO (UNITED STATES), INC.; LENOVO (SHANGHAI) ELECTRONICS TECHNOLOGY CO. LTD.; LENOVO BEIJING, LTD.; LENOVO GROUP, LTD.; MOTOROLA (WUHAN) MOBILITY TECHNOLOGIES COMMUNICATION CO., LTD; and MOTOROLA MOBILITY, LLC, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |
| LENOVO (UNITED STATES), INC., and MOTOROLA MOBILITY, LLC, | ) ) ) |
| Counterclaim-Plaintiffs, | ) ) |
| v. | ) ) |
| TELEFONAKTIEBOLAGET LM ERICSSON, ERICSSON AB, and ERICSSON INC. | ) ) ) ) |
| Counterclaim-Defendants. | ) |

<u>ORDER</u>

This matter is before the Court on Defendants and Counterclaim-Plaintiffs Lenovo (United States), Inc. ("Lenovo US") and Motorola Mobility LLC's motion for temporary restraining order and anti-suit injunction. [DE 35]. Lenovo US and Motorola Mobility seek an anti-suit injunction

prohibiting Plaintiff and Counterclaim-Defendant Telefonaktiebolaget LM Ericsson from enforcing injunction orders issued in foreign jurisdictions.

The motion for TRO and anti-suit injunction has been fully briefed. The Court held a hearing on 11 January 2024 in Elizabeth City, NC, where Ericsson, Lenovo US and Motorola Mobility were represented by counsel. The motion is ripe for decision. For the following reasons, the Court denies Lenovo's motion for an anti-suit injunction.

## BACKGROUND

Lenovo and Ericsson are major players in the mobile telecommunications industry.[1] Their patent portfolios comprise domestic and international patents implemented into cellphones and other cellular network applications. For over a decade, the parties have negotiated towards a global cross-licensing agreement that would allow Lenovo and Ericsson to implement the other's essential patents into their devices. Recent negotiations have focused on patents essential to the 5G network. They have not proved fruitful, and the parties have taken their dispute to the courts. And not only in the Eastern District of North Carolina but also Brazil, Colombia, and the United Kingdom.

Now, Lenovo moves for an anti-suit injunction to prevent Ericsson from enforcing injunction orders it obtained against the sale of Lenovo products in foreign jurisdictions, particularly Colombia and Brazil. Because the parties are bound together by a common commitment to industry practices, understanding those commitments and their implications is essential to resolving the instant motion.

---

[1] As the caption makes clear, Lenovo and Ericsson are multinational corporations comprising domestic and international subsidiaries and affiliates. Throughout this Order, the Court will refer to Lenovo and Ericsson collectively deviating only where there is a meaningful distinction between the various subsidiaries and affiliates.

The Court ventures to say that most consumers are unaware, perhaps blissfully so, of the inner workings of cellular networks. One of the features that most take for granted is the ability to send and receive text messages, e-mails, and phone calls regardless of who manufactured the device, who designed its operating system, and which carrier facilitates their network connection. This seamless interconnectivity has a technical term: interoperability.

Interoperability is the result of technical standards set by private organizations, organizations known, aptly, as standard development organizations ("SDOs"). The standards govern how cellular devices access the cellular network by setting forth the technical specifications that act like a blueprint for manufacturers and network operators. The European Telecommunications Standards Institute, a foremost SDO in the telecommunications industry, helped promulgate the 3G, 4G, and 5G standards through its participation in the 3rd Generation Partnership Project ("3GPP"). Both Lenovo and Ericsson are members of the ETSI. When the ETSI and other members of the 3GPP set standards, they often incorporate patented technology created by members of the SDO. A patent that is selected to be part of the standard is known as a standard essential patent. What makes the patent essential is the impossibility of complying with the standard without infringing on that patent.

Standards do more than just facilitate interoperability. Standards are good for the consumer because they also lower costs and increase price competition. *Microsoft*, 696 F.3d 876. Standards are great for patent holder because they contain the seeds of disproportionate market power. Once a standard has been accepted by the market, the patent holder is positioned to extract high royalties from those who wish to implement the SEPs. If the implementer wants to offer products connected the latest and best technology, they have a choice: The implementer can license the essential patent from the patent holder at the terms set by the patent holder, or the implementer can infringe on the

3

essential patent and risk a patent infringement lawsuit. *See HTC Corp. v. Telefonaktiebolget LM Ericsson*, 12 F.4th 476, 481 (5th Cir. 2021).

To combat such an imbalance, known as "patent holdup," many SDOs tip the scales towards equipoise by imposing conditions on essential patents. *Id.* The ETSI's IP rights policy checks anti-competitive behavior by securing voluntary commitments from the owners of would-be essential patents to license their patents on fair, reasonable, and non-discriminatory terms ("FRAND"). Specifically, Clause 6.1 of the IP rights policy requires the patent holder to commit to "an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory ("FRAND") terms and conditions . . . [which] may be made subject to the condition that those who seek licenses agree to reciprocate." Comp. ¶34. [DE 1]; Countercls. ¶24, [DE 29]. This commitment undercuts the patent holder's ability to engage in anti-competitive behavior. Companies seeking to license the essential patents become third-party beneficiaries of the contract between the essential patent holder and the ETSI, ensuring that they will be able to license the essential patent at a FRAND rate. *HTC*, 12 F.4th at 481.

This commitment to offer a FRAND rate, powerful as it may be, binds ETSI members to a goal while leaving how to get there up to the patent holders and implementers. That is, the patent holder is required only to offer license terms that are FRAND. How the parties arrive at those terms and what it takes to hammer out a deal is left for the parties to determine. *See* Adam Mossoff, *Patent Injunctions and the FRAND Commitment: A Case Study in the ETSI Intellectual Property Rights Policy*, 38 Berkeley Tech. L.J. 487, 498 (2023).

Ericsson and Lenovo hold essential patents (either directly or through their related entities) incorporated in the 5G cellular standard. Both are members of the ETSI. Both have agreed that they are prepared to grant licenses to implementers on FRAND terms. And both agree that they

4

are beneficiaries of the other's commitment. What they haven't been able to agree on is the terms of a global cross-license, and not for a lack of trying.

Ericsson and Lenovo have negotiated over a global cross-license for various essential patents for over a decade. During these negotiations Lenovo purchased Motorola, which entered into a licensing agreement with Ericsson in 2011. What started as a negotiation for 2G and 3G essential patents has evolved, as technology does, into a dispute over 4G and 5G essential patents. The most recent phase of those negotiations—the phase over 5G essential patents—is what matters for the motion currently before the Court.

In 2017 Ericsson publicly announced its 5G royalty rates in advance of the 3GPP's announcement of the 5G standard. Ericsson states that it was prepared to grant licenses at a rate of $5 per 5G device with a floor of $2.5 per device. Around that same time, Lenovo and Ericsson's negotiations began to include discussion over the 5G patents. In 2018, Lenovo and Ericsson mediated with both exchanging offers the other considered not FRAND. Since then, the parties seem to have spent much of their time negotiating non-disclosure agreements that would facilitate the sharing of confidential information about the essential patents. Compl. 80–81, [DE 1]; Countercls. ¶¶32–40, [DE 29].

On 11 October 2023, Ericsson made an offer to cross-license its portfolio of 5G standard essential patents at a rate of 1% per 5G device with a $4 cap. Mem. in Opp'n, Ex. 5, [DE 47-7]. An offer, Ericsson highlights that is below its publicly announced FRAND rate of $5 per device. Additionally, Ericsson maintains that rate for its 5G patent portfolio is FRAND because the Fifth Circuit recently affirmed a jury verdict declaring that same rate to be FRAND for Ericsson's 4G patents. *HTC Corp. Telefonaktiebolaget LM Ericsson*, 407 F.Supp.3d 631, 633–641 *aff'd*, 12 F.4th 476 (5th Cir. 2021).

The day Ericsson offered a global cross-license at a rate of 1% per 5G device capped at $4 per device, it filed its complaint before the Court:

- Count 1 through Count 4 allege that Lenovo infringes on four of Ericsson's domestic 5G essential patents.

- In Count 5, Ericsson alleges that Lenovo breach obligations created by the ETSI IP rights policy. Specifically, that once Lenovo began negotiations for FRAND terms it was obligated under French law to negotiate in good faith;

- In Count 6, Ericsson alleges that Lenovo breached its contractual commitments under the ETSI IP rights policy which Lenovo is entitled to rely on as a third-party beneficiary of Ericsson's commitments to the ETSI;

- Count 7 asks for a declaration that Ericsson's 11 October 2023, offer complied with its FRAND commitment. And, if the Court declares that offer was not FRAND, Ericsson requests the Court declare a FRAND rate for a global-cross license.

Compl. ¶¶ 146–222, [DE 1]. In December, Lenovo US and Motorola Mobility asserted counterclaims that largely mirror Ericsson's complaint:

- Count 1 alleges that Ericsson breached its obligations under the ETSI IP rights policy;

- Count 2 claims that Ericsson breached its obligation under the ETSI IP rights policy to negotiate in good faith when it refused to offer its essential patents on FRAND terms;

- Count 3 seeks a declaration setting FRAND royalty rates for a global patent cross-license between Ericsson and Lenovo US;

- Count 4 through Count 7 allege that Ericsson infringes on four of Motorola Mobility's essential 5G patents.

Countercls. ¶¶ 42, 50, 55, 60, 90–125, [DE 29].

In addition to their claims and counterclaims before this Court, Lenovo and Ericsson have filed parallel complaints with the United States International Trade Commission:

- On 11 October 2023, Ericsson filed an ITC complaint covering the four 5G SEPs that are the subject of its patent infringement claims here. On 12 December

2023, Ericsson filed another complaint covering four patents that it claims are essential to the HEvCH/H.265 Video Standard. Opp'n 9–10, [DE 47].

- On 16 December 2023. Motorola Mobility filed an ITC complaint against Ericsson LM, Ericsson AB, and Ericsson Inc. alleging unlawful importation, sale for importation, and sale within the Untied States after of 5G New Radio antenna units that incorporate the Four SEPs asserted in its counterclaims before this Court. Opp'n, Ex. 14, [DE 48-5].

The Eastern District is just one front in the parties' dispute. Since Ericsson filed its complaint in October, the parties have been busy litigating in foreign jurisdictions. On 13 October 2023, two days after Ericsson filed its complaint here, Lenovo filed an action in the High Court of England and Wales:

- Lenovo US and Motorola Mobility's action seeks, among other things, a determination of FRAND terms for a global cross-license agreement between Lenovo and Ericsson, and Lenovo provided an undertaking to the UK court that it will enter into a license agreement determined FRAND as a result of the UK proceedings.

- On 15 December 2023, Lenovo amended its complaint to include a request for injunctive relief against infringement of its UK patents. Specifically, Lenovo seeks an injunction preventing Ericsson from infringing on its UK patent, provided that such an injunction will be lifted if the parties enter a license agreement on FRAND terms.

- For its part, Ericsson contests the UK court's jurisdiction over the FRAND related claims but does not contest that the UK court has jurisdiction to hear Lenovo's UK patent infringement claim.

Mem. in Supp. 11–12, [DE 40]; Opp'n 10, [DE 47]; Opp'n, Ex. 13 ¶¶ 10A, 56, 56A, [DE 48-4].

On 20 November 2023, Ericsson began filing a series of patent infringement actions in Colombia:

- On 20 November 2023, Ericsson filed a patent infringement action against Lenovo's Colombian affiliate, Motorola Mobility Colombia S.A.S. as well as several of Lenovo's customers.

- Under Colombian law, owners of intellectual property can get an injunction from the Superinterdencia de Industria y Comercio ("SIC"), an administrative office with judicial power of trademark and patent infringement.

7

- On 13 December 2023, the SIC enjoined Motorola Mobility Colombia to cease marketing, offering for sale, selling, using or importing certain 5G cell phones.

Supp., Ex. 3 ¶¶ 16, 17, 19, [DE 40-3]; Opp'n, Ex. 2 ¶ 20, [DE 47-4].

The day after Ericsson began its Colombian actions, Ericsson filed an action for patent infringement in Brazil:

- At issue were two of Ericsson's Brazilian patents that it claims are essential to the ETSI's 5G standard. Ericsson alleges that Lenovo's Brazilian affiliates, Lenovo Technologia Brasil LTDA and Motorola Mobility Comercio De Productos LTDA infringed on those essential patents.

- Ericsson requested a preliminary injunction enjoining Lenovo from infringing on its Brazilian patents.

- Lenovo responded on 23 November opposing the injunction and moved to seal the case, which the Brazilian court did.

- On 27 November 2023, the Brazilian court entered a preliminary injunction. Lenovo must refrain from implementing the 5G essential patents at issues. The injunction would not take effect until 20 December 2023.

- On 11 December 2023, Lenovo's interlocutory appeal was denied; a week later, its motion for reconsideration was also denied.

Supp., Ex. 2 ¶ 4, [DE 37-1]; Opp'n, Ex. 1 ¶¶ 20, 24, 25, [DE 47-3].

From Lenovo's perspective, the Brazilian and Colombian injunctions pose significant challenges to its global strategy. Brazil and Colombian are growing markets for Lenovo's 5G offerings. Supp., Ex 1 ¶¶ 8, 10, 11, [DE 37]. And it alleges that Ericsson pursued injunctions in those jurisdictions because of their strategic importance to Lenovo and the relative ease, in Lenovo's opinion, of obtaining injunctive relief in those jurisdictions as compared to the United States. Lenovo casts Ericsson's action in Brazil and Colombia as an attempt to coerce Lenovo into accepting supra-FRAND terms. For its part, Ericsson responds that foreign courts have jurisdiction to enforce the rights of patent holders within their territorial bounds according to their procedures.

Ericsson views Lenovo actions as a refusal to negotiate in good faith, alleging that Lenovo is implementing Ericsson's essential patents without paying its fair share.

On 29 December 2023, Lenovo US and Motorola Mobility filed an application for a TRO and anti-suit injunction in this Court. [DE 35]. Lenovo states that the essential patents at the heart of the foreign injunctions are subject to Ericsson's commitment to the ETSI to license on FRAND terms, an issue that is squarely before this Court and the UK court. Thus, according to Ericsson, the foreign injunctions will be resolved through a payment of money damages and that issue should be resolved without the pressure of the Brazilian and Colombian injunctions.

On 2 January 2024, Ericsson responded to Lenovo's motion. Ericsson contends that the Brazilian and Colombian actions involve foreign patent rights enforceable in the courts of the foreign sovereigns. Any attempt to collaterally attack the foreign injunctions, Ericsson argues, offends norms of international comity and thus amounts to nothing more than a delay tactic.

On 11 January 2024, the Court held a hearing on Lenovo's motion for anti-suit injunction. Ericsson and Lenovo US and Motorola Mobility were represented by counsel. The motion is ripe for decision.

## DISCUSSION

Before the Court can address whether an anti-suit injunction is warranted, it must first address the form such equitable relief would take. Lenovo styled its motion as a request for a temporary restraining order yet asked the Court to preliminary enjoin Ericsson from enforcing the Brazilian and Colombian injunctions until the FRAND licensing dispute is resolved. One of the key distinctions between a TRO and the preliminary injunction is that the former is inherently limited in duration while the latter has no inherent constraints. *Compare* Fed. R. Civ. P. 65(a) *with*

9

65(b). Thus, Lenovo's motion has the procedural trappings of a TRO but the substance of as motion a preliminary injunction.

Federal Rule of Civil Procedure 65 governs both TROs and preliminary injunctions in a fluid interplay. *See Ciena Corp. v. Jarrad*, 203 F.3d 312, 319–20 (4th Cir. 2000). Because of this fluidity, district courts may properly treat a motion for a TRO as a motion for a preliminary injunction provided the non-moving party has a fair opportunity to oppose the motion. *See U.S. Dep't of Lab. v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 283 (4th Cir. 2006).

This fair opportunity comes down to notice. How much notice must be given before the Court can enter the preliminary injunction? Rule 65 doesn't say. *Ciena Corp.* 203 F.3d at 319. Instead, Rule 65's notice requirement is "more substantive than technical, requiring a defendant be given a fair opportunity to oppose the application, as distinct from a specified number of hours or days." *Wolf Run Mining*, 452 F.3d at 283 (internal quotation marks and citations omitted).

The Court has little trouble concluding that Rule 65's substantive requirement has been met here. Lenovo moved for a TRO on 29 December 2023. [DE 35]. Ericsson filed a memorandum in opposition on 2 January 2024. [DE 47]. That same day, the Court set a date for the hearing on 11 January 2024, 13 days after Lenovo filed its motion for a TRO. A duration more than sufficient to give Ericsson a fair opportunity to oppose Lenovo's motion for injunctive relief. *See Wolf Run*, 452 F.3d at 281–84 (holding that notice within 24 hours of the hearing provided fair opportunity to oppose preliminary injunction); *Cienna*, 203 F.3d at 320 (concluding that 2 days' written notice of hearing on TRO converted into a preliminary injunction did not deny fair opportunity to oppose). What's more, not only does Ericsson not object to converting Lenovo's request for a TRO into a preliminary injunction but it expressly asked the Court to do so. Opp'n 29, [DE 47]. Accordingly, the Court treats Lenovo's motion for a TRO as a motion for a preliminary injunction.

An "extraordinary remedy never awarded as of right[,]" a preliminary injunction forces courts of equity to balance the parties competing claims of injury with the effect that granting the injunction would have on each party as well as the consequences to the public. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008). The competing concerns animating the extraordinary nature of preliminary injunctions are heightened when the equitable powers of the federal courts are sought to enjoin parties from litigating in foreign courts. Although an anti-suit injunction ostensibly operates only against the parties not the foreign court, "such an order effectively restricts the jurisdiction of the court of a foreign sovereign." *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987). Thus, while a district court with jurisdiction over the parties has the power to enjoin them from proceeding with a parallel lawsuit in a foreign country, that power should be exercised "sparingly." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 479 (4th Cir. 2018) (internal quotations marks and citation omitted).

The anti-suit injunction has consequences not present in a run-of-the mill preliminary injunction. As a result, the standard test for a four-part test preliminary injunction is inapposite. *See Ganpat v. E. Pac. Shipping PTE, Ltd.*, 66 F.4th 578, 584–85 (5th Cir. 2023) (explaining that the traditional four-part test has never been a part of the circuit's analysis for an anti-suit injunction); *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th Cir. 2006) (holding that the movant "need only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the injunction."); *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 19 (1st Cir. 2004) (counseling district court that they "have no obligation to employ [the traditional four-part test]" when dealing with international antisuit injunctions). Instead, the propriety of an anti-suit injunction is assessed in three-steps. *See, e.g.*,

11

*BAE Sys. Tech. Sol. & Servs., Inc. v. Rep. of Korea's Def. Acquisition Program Admin.*, 195 F.Supp.3d 776, 786 (D. Md. 2016).

First, the movant must satisfy two threshold requirements: (1) that the parties and issues are the same in both matters and (2) that resolution of the case before the enjoining court is dispositive of the action to be enjoined. *E.g., Microsoft*, 696 F.3d at 882. And, because the threshold requirements must be satisfied before the factors in the second step can be considered, this first step might be the only step. *See Canon Lat. Am., Inc. v. Lantech (CR), S.A.*, 508 F.3d 597 (11th Cir. 2007); *Quaak*, 361 F.3d at 18 ("The gatekeeping inquiry is, of course, whether parallel suits involve the same parties and issues."); *Sanofi-Aventis Deutschland GmbH v. Genetech, Inc.*, 716 F.3d 588, 595 (Fed. Cir. 2013) (Dyk, J., concurring) (stating that the majority opinion was wrong to consider additional factors when the threshold considerations were not met).

Second, the movant must show that at least one of the anti-suit injunction factors applies. *Microsoft*, 696 F.3d at 881. These factors include "whether the foreign litigation would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable consideration." *Id.* at 882 (cleaned up) (quoting *E & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006)). In addition, the Second Circuit considers a fifth factor—whether the parallel litigation would result in delay, inconvenience, expense, inconsistency, or race to judgment. *See Karaha Bodas Co. L.L.C. v. Perusahaan Pertambanagan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir. 2007).

Third, if the threshold requirements are met and at least one of anti-suit injunction factors applies, the court assesses the injunction's effect on international comity. " 'Comity' summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum

must pay to the act of foreign government not otherwise binding on the forum." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). In practice, comity serves as the mortar that cements the brick house of the international system. *Id.* Care must be taken to preserve this mortar even where litigation involves private parties because enjoining a party from proceeding in a foreign court effectively restricts the jurisdiction of a foreign sovereign's courts. *See China Trade*, 837 F.3d at 35.

Almost all of the circuit courts have adopted one of two approaches to weighing the effect of an anti-suit injunction on international comity—the restrictive "conservative approach" or the permissive "liberal approach."[2] These labels come from how much weight each approach accords to international comity: The liberal approach places less weight on international comity whereas the conservative test places greater emphasis on international comity. *See Quaak*, 361 F.3d at 17–19 (outlining the two approaches and adopting the conservative approach because "the liberal approach assigns too low a priority to [international comity]"); *BAE Sys.*, 884 F.3d at 479 ("[T]he principal different is that the liberal approach accords less weight to international comity concerns."). Although the liberal approach places a modest emphasis on international comity, an injunction will issue "whenever there is a duplication of parties and issues and the court determines that the prosecution of simultaneous proceedings would frustrate the speedy and efficient determination of the case." *Quaak*, 361 F.3d at 17. Under the conservative approach, however, an

---

[2] The liberal approach has been adopted by the Fifth and Ninth Circuits. *See Ganpat*, 66 F.4th 578 (5th Cir.); *Gallo*, 446 F.3d 984 (9th Cir). The conservative approach has been adopted by the First, Second, Third, Sixth, Eight, and District of Columbia Circuits. *See Quaak*, 361 F.3d 11 (1st Cir.); *China Trade*, 837 F.3d 33 (2d Cir.); *GE v. Deutz AG*, 270 F.3d 144, 161 (3d Cir. 2001); *Gau Shan Co., Ltd. v. Bankers Tr. Co.*, 956 F.3d 1349, 1352–54 (6th Cir. 1992); *Goss Int'l Corp v. Man Rolan Druckmaschinen Aktiengelsellschaft*, 491 F.3d 355, 359–61 (8th Cir. 2007); *Laker Airways,* 713 F.2d 909 (D.C. Cir). The Seventh Circuit hasn't committed to either approach but has signaled that it is "inclined towards the laxer standard." *1st Source Bank v. Neto*, 861 F.3d 607, 613 n.2 (7th Cir. 2017). The Federal Circuit has employed the liberal test because it applies the law of the regional circuit when dealing it handles issue not unique to patent law. *Sanofi-Aventis*, 716 F.3d at 591–92.

"antisuit injunction will issue only if the movant demonstrates (1) an action in a foreign jurisdiction would prevent United States jurisdiction or threaten a vital United States policy, and (2) the domestic interests outweigh concerns of international comity." *Goss Int'l*, 491 F.3d at 359.

The Fourth Circuit has not weighed in on the proper test to apply. *BAE Systems*, 884 F.3d at 479. Without clear guidance from the circuit, some district courts have resorted to using both approaches. *See, e.g.*, *Custom Polymers PETs, LLC v. Gamma Meccanica SPA*, 185 F.Supp.3d 741, 757–61 (D.S.C. 2016). The Court does not need to commit itself to an approach at this time. Deciding which approach to apply is a consideration that comes only after the first two steps are resolved in favor of the anti-suit injunction. So the Court will address the steps in order reaching the third-step only if necessary.

Again, the first step is "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *Sanofi-Aventis*, 716 F.3d at 591. The parties need not be identical. It is enough that they are "substantially similar." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Information Tech., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004); *Quaak*, 361 F.3d at 20. On this Lenovo and Ericsson agree. Supp. 14, [DE 40]; Opp'n 19, [DE 47].

Ericsson argues that Lenovo cannot show substantial similarity because the Lenovo entities seeking the anti-suit injunction—Lenovo US and Motorola Mobility—are not the Lenovo entities enjoined in Brazil and Colombia. What's more, the Lenovo entities here can neither show that they are the controlling shareholders of Lenovo' Brazilian and Colombian entities nor that they can otherwise control them. Ericsson also points out that the parent company that controls all Lenovo entities, Lenovo China, has neither appeared nor accepted service in this case.

14

The decisive point is that the Brazilian and Colombian entities—Lenovo Tecnologia Brasil, Motorola Mobility Comercio De Produtos Electronicos LTDA, and Motorola Mobility Colombia S.A.S—are named in the Brazilian and Colombian actions because of their identity with Lenovo US. *See Paramedics*, 369 F.3d at 652. It's not a secret that the Brazilian and Colombian actions are a direct result of Lenovo US's negotiations with Ericsson. Although Ericsson stresses that Lenovo US does not control the foreign entities, the record supports that Lenovo US has the authority to negotiate with Ericsson to reach a global patent cross-license comprising both Lenovo US's and its related entities essential patents. Answer ¶ 215, [DE 29]. And it is undisputed that the Brazilian and Colombian entities are part of the Lenovo family, a family that Ericsson alleges acts as a "unitary business venture." Compl. ¶18, [DE 1]. Thus, the Court concludes that Lenovo US is substantially similar with the foreign defendants in the one way that really matters here.

Although stated as two components of the threshold inquiry, whether the issues in the domestic and foreign actions are the same and whether the first action is dispositive of the foreign action to be enjoined operate as one requirement. *Microsoft*, 696 F.3d at 882–83; *see also Sanofi-Aventis*, 716 F.3d at 591 ("[T]he issues need not be identical; it is enough they are functionally the same such that the result in one action is dispositive of the other." (citing *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009))). The Court reads "dispositive" based on its ordinary usage as being outcome determinative. *See Canon*, 508 F.3d at 601 n.8 (concluding, "in the interest of international comity and judicial restraint," that dispositive means to settle or finish a dispute).

Lenovo argues that the underlying licensing dispute before the court will be dispositive of the Brazilian and Colombia actions. Because those actions involve claims for patent infringement on 5G essential patents covered by Ericsson's FRAND commitment and Ericsson has included

those patents in its global licensing offer, Lenovo reasons that resolving the FRAND rate in either this Court or the UK court will necessarily moot the foreign actions. What's more, Lenovo highlights that its counterclaim for declaratory relief asks the Court to set FRAND terms for a global-cross license covering those SEPs in the foreign proceedings. So even if it won't accept Ericsson's offer if it is declared FRAND, Lenovo contends that it will accept the FRAND rate set by the Court.

Lenovo's arguments are unpersuasive. The rub is that Lenovo conflates two separate issues arising from the parties' ETSI commitments and glosses over the nuances of Ericsson's position. Regarding the ETSI commitments, there are two issues: was Ericsson's 11 October offer FRAND? And what is FRAND rate for a global cross-license? Lenovo represents that the issue of setting a global rate is squarely before the Court. But it is more complicated than Lenovo leads on. On the one hand, Lenovo US requests a declaration of a FRAND rate for a global cross-license. Countercls. ¶89, [DE 29]. Ericsson, on the other hand, first requests a declaration that it's 11 October offer is FRAND, and should the Court conclude it wasn't, for the Court to declare a FRAND royalty rate for a global cross-license on essential patents. Compl. 59–60, [DE 1]. So unlike Lenovo request for declaratory judgment on a FRAND rate, Ericsson's request is contingent on the Court resolving the antecedent issue of the FRAND offer.

So, what happens if Ericsson's 11 October offer is FRAND? Lenovo has neither committed to accepting Ericsson's offer if its FRAND nor would it be forced to. Instead, Lenovo would be presented with the choice between (1) accepting the FRAND offer, (2) rejecting it and not implementing Ericsson's essential patents, or (3) rejecting it, implementing the essential patents, and exposing itself and its related entities to actions for infringement. *See Ericsson Inc. v. Apple Inc.*, No. 2:21-cv-00376-JRG, (E.D. Tex. May 2, 2022) (explaining the options available after an

offer is adjudicated FRAND). It is not the business of the federal courts to draft agreements for the parties, and it makes little sense to start now. *See Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178, 2012 WL 5416931, at *1 (W.D. Wis. Nov. 2, 2012) (reasoning that it would be inappropriate to determine "a FRAND rate that may be used solely as a negotiating tool between the parties"); *InterDigital Commc'ns, Inc. v. ZTE Corp.*, 1:13-cv-00009, 2014 WL 2206218, at *3 (D. Del. May 28, 2014) (same).

Lenovo maintains that the Ninth Circuit's decision in *Microsoft* should control the outcome here. 696 F.3d 872. In *Microsoft*, the Ninth Circuit concluded that the district court had not abused its discretion in granting an anti-suit injunction because of the character of the underlying contract dispute. 696 F.3d at 882–85. So too here is the underlying contract dispute controlling. The meaningful distinction is that holding the parties to their obligations in the ETSI IP rights policy will not necessarily result in a global cross-license that resolves the foreign patent actions. This conclusion does not rest on the territorial nature of the Brazilian and Colombian essential patents. Only the courts of those sovereigns can resolve claims for infringement on their respective patents. *Id.* at 882; *see also Canon*, 508 F.3d at 602 (collecting cases where injunctions were vacated because foreign suits involved foreign rights enforceable in courts of the sovereign). Instead, the Court, like the Ninth Circuit in *Microsoft*, reasons from the effect that resolving the underlying contract claims under the ETSI IP rights policy would have on the foreign infringement actions.

In sum, the Court is not persuaded that resolving the underlying contract issues will force either Lenovo or Ericsson into a global licensing agreement that would resolve the patent infringement claims at the core of the Brazilian and Colombian actions. Thus, Lenovo has failed to satisfy that the threshold requirements. Its motion for an anti-suit injunction is, therefore, denied.

17

## CONCLUSION

For these reasons, the Court **DENIES** Lenovo US and Motorola Mobility's motion for a temporary restraining order and anti-suit injunction. [DE 35].

SO ORDERED, this 13 day of February 2024.

*Terrence Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE